Robert E. BARNES, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 19313.

United States Court of Appeals
District of Columbia Circuit.

Argued April 22, 1966.

Decided May 3, 1966.

Opinions May 27, 1966.

Mr. Boris Haskell, Washington, D. C.
(appointed by this court), for appellant.

Mr. Robert S. Brady, Atty., Dept. of
Justice, with whom Messrs. David G.
Bress, U. S. Atty., Frank Q. Nebeker and
Victor W. Caputy, Asst. U. S. Attys.,
were on the brief, for appellee. Miss
Carol Garfiel, Asst. U. S. Atty., also en-
tered an appearance for appellee.

Before PRETTYMAN, Senior Circuit
Judge, and FAHY and LEVENTHAL, Circuit
Judges.

PER CURIAM:

The appeal is from a conviction of
housebreaking, grand larceny and assault.
Defendant did not testify; and the case
did not present an occasion for introduc-
ing evidence of defendant's criminal rec-
ord. Nevertheless the prosecution, over
defense objection, was permitted to intro-
duce in evidence a "rogues gallery" or
"mug shot" photograph of defendant, con-
veying to the jury the information that
defendant had a police record. This prej-
udice was not dissipated by some taping
placed over some words or figures at the
bottom of the photograph. Because the
admission of this evidence was preju-
dicial error we reverse and remand the
case for a new trial.

It is so ordered.

A fuller statement of the reasons for
reversal will be filed at a later date.

PRETTYMAN, Senior Circuit Judge,
dissents, and will file a dissenting opin-
ion at a later date.

Opinions Filed May 27, 1966

LEVENTHAL, Circuit Judge:

This is an appeal from a conviction for
housebreaking, grand larceny, and simple
assault. The defense was alibi. Appel-
lant did not testify.

Before the trial began, the judge asked
about identification of the appellant from
a line-up. The prosecutor replied, "I
have no line-up." When the judge then
asked about a witness' identification re-
ferred to in the arrest warrant, the pros-

ecutor replied, "I am not going into that." The judge then expressed his view that a police picture of a defendant could be introduced into evidence, if the witness were coached in advance to avoid a statement that it was a police picture. This ensued:

THE PROSECUTOR: That has been my view.

THE COURT: And I would like somebody to give me a chance to try it out, so that the Court of Appeals can rule.

THE PROSECUTOR: I would like to try it.

DEFENSE COUNSEL: You are going to get it in this case.

THE COURT: If he does it.

And in due course the prosecution, pursuant to its indication before the trial began, introduced police photographs of the appellant and propelled prejudicial error into the trial.

Defense cross-examination of the Government witness who saw the crime and identified appellant in court focused on the identification. Thus, the witness was called upon to explain remarks in the court house the previous day that were open to the construction of reflecting some uncertainty: "I think that is the man." Defense counsel brought out that she had initially identified the appellant from photographs shown her by the police immediately after the crime. On redirect, the prosecutor showed the photographs to the witness, who confirmed her identification. The photographs were then introduced into evidence and shown to the jury, over defense objection.

The first photograph of appellant, Government Exhibit 2, is a full-length snapshot of an ordinary nature, and presents no problem. Government Exhibit 3, however, is a typical "mug shot" from a po-

lice department "rogues' gallery." It consists of two close-up shots of appellant's face side by side, one full face and one a profile photograph. This exhibit was introduced into evidence and shown to the jury with a wide strip of adhesive tape covering the prison numbers on the bottom half of the photographs. Pieces of paper were placed over the back of both exhibits to cover written material. When Exhibit 2 was shown to the jury, the judge specifically told them that the paper covered up material irrelevant to the case. At the close of his instructions, the trial judge explained to the jury his reluctance to allow them to take the exhibits with them into the jury room because of the danger that one of them might inadvertently remove the covering and see the written material. We think the introduction of the mug shot was substantial and prejudicial error that requires reversal.

■■ It is well-settled law that the criminal record of a defendant may not be introduced into evidence at trial unless the defendant takes the stand or otherwise places his character in issue.[1] A photograph which on its face reveals the existence of such a criminal record is likewise inadmissible when the defendant's character has not been placed in issue.[2]

Some courts have held that such pictures may be introduced into evidence where the nature of the photograph is effectively kept from the jury's knowledge. Thus, in a recent Texas decision,[3] the court upheld the admission of a police picture of the defendant where "all identification marks were removed, and, as far as the jury were able to determine, it might have been taken in a penny arcade." No such reasoning can justify Government Exhibit 3 in this case. The double-shot picture, with front and profile shots alongside each other, is so familiar,

1. See generally WIGMORE, EVIDENCE §§ 192–194 (3d ed. 1940); Leigh v. United States, 113 U.S.App.D.C. 390, 308 F.2d 345 (1962). Even where the defendant has taken the stand, evidence of prior crimes is not automatically admissible. Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763, 768–769 (1965).

2. SCOTT, PHOTOGRAPHIC EVIDENCE § 658, at p. 558 (1942); Roberts v. Commonwealth, 350 S.W.2d 626, 628 (Ky.1961).

3. Huerta v. State, 390 S.W.2d 770, 772 (Tex.Crim.App.1965).

from "wanted" posters in the post office, motion pictures and television, that the inference that the person involved has a criminal record, or has at least been in trouble with the police, is natural, perhaps automatic. The rudimentary tape cover placed over the prison numbers on the photograph, and over the notations on the reverse side, neither disguised the nature of the picture nor avoided the prejudice. If anything, by emphasizing that something was being hidden, the steps taken here to disguise the nature of the picture may well have heightened the importance of the picture and the prejudice in the minds of the jury.

The Supreme Court of Indiana has pointed out the likely and unnecessary prejudice. Discussing a similar prosecution exhibit, the court noted that the photographs had little or no probative value in themselves, since the witness had identified the defendant in court, and stated:

> Pictures of criminals showing a front and profile view, with a number displayed on the breast, are common and familiar. If the evidence had been offered for the good-faith purpose of showing that the witness could identify a photograph of the defendant, these pictures might have been cut apart and that portion where the number is displayed cut away. But it is obvious that thus presented they would have no more relevancy or probative force than a kodak picture taken in the court room or in the defendant's home. It may well be doubted whether the jurors remained in ignorance of the fact that the photographs and card [on which the photographs were pasted] had to do with some criminal record of the defendant. It was not proper

to prove that the defendant had a criminal record, and what may not be done directly may not be done by indirection or subterfuge.[4]

Here the makeshift taping was placed over the exhibit after it had been shown to the witness in the presence of the jury, after defense counsel, again in the presence of the jury, had objected to the introduction of the pictures,[5] and after the prosecutor had asked the court if he could show the picture to the jury. (Reply: "Not yet. Come to the bench.") With this background it is disingenuous for the Government to argue that its Exhibit 3 probably appeared to the jury as merely a couple of ordinary photographs.

We now consider whether the prejudice of the prosecution's photographs is to be dismissed as having been "invited" by defense counsel. Defense counsel had raised at least a question—he hoped a reasonable doubt—about the witness' "live" identification of defendant as of the time of the trial, strictly speaking, the previous day. But of course the jury was aware that there was presumably previous identification by the witness, sufficient to bring this particular defendant into the court room. The further questioning by defense counsel established weaknesses of the previous identification. First, it was an identification by photograph, and not of the human being. And, significantly, the witness had been shown photographs of only one person—so that the identification of appellant reflected a non-selective process, i. e. a one-man photographic line-up. As Judge Sobeloff has recently emphasized, the dangers of mistake inherent in human identification are always heightened "when the identifier is presented with no alternative choice; there is then

4. Vaughn v. State, 215 Ind. 142, 19 N.E.2d 239, 241 (1939).

5. The case illustrates the recurrent problem of jurors being aware of evidence sought to be introduced before defense counsel has a chance to object or the court a chance to rule. The proper procedure would be for the prosecutor to show defense counsel and the court the pictures outside the presence of the jury. Compare Johnson v. United States, 121 U.S.App.D.C. 19, 347 F.2d 803, 806 (1965).

a strong predisposition to overcome doubts and to fasten guilt upon the lone suspect." [6] The trial judge well understood the importance of this line of questioning, and when the witness did not answer the question as put by defense counsel the judge sharpened the inquiry to ask whether the witness had been shown photographs of only one man.

This approach could not be put forward by defense counsel without some risk to the accused, for the testimony that the police had on hand photographs of the accused might conceivably have led a juror, at least a sophisticated juror, to hypothesize that the accused had a police record. But defense counsel was not required to pay the price of having defendant's criminal record dramatically and almost unmistakably placed before the jury through the jury's inspection of the mug-shot photograph with its supposed tape "concealment" of the underlying record.

For present purposes we may assume, without deciding, that the prosecution was entitled to buttress its witness identification testimony on redirect. That was adequately accomplished here by the introduction of Exhibit 2, the full-length picture, the only one covered in any detail during cross-examination by defense counsel. We have no need to consider here whether, if the prosecutor has a need and legitimate reason for presentation of the other photographs, he may do so by making suitable arrangements, by separation and copying, avoiding the incriminatory prejudice.

Introduction of the mug-shot pictures cannot be excused on the theory that if they had not been introduced defense counsel would have been able to make an argument to the jury that the witness' identification of appellant was so

dubious that the Government was unwilling even to show the pictures to the jury. If that had been the prosecutor's concern, it would have been fully allayed by stipulation, or at most by acting outside the hearing of the jury when first bringing up the photographs.[7] This would have protected the Government, since any objection to the photographs would have precluded defense counsel from in any way arguing to the jury that the Government was unwilling to produce them. That this did not define the purpose of the prosecutor here appears clearly enough from his insistence on getting the mug-shot photographs into the hands of the jury. Immediately after accepting the two exhibits in evidence the judge rejected the prosecutor's request to show them to the jury. He called for a bench conference and said that the backs of the photographs should be covered up. Defense counsel pointed out that material on the face of Exhibit 3 was even more objectionable. The prosecution offered to cover that up. Defense counsel objected that the covering up would make the jury even more suspicious and curious as to what was being concealed. The court was troubled and said: "I think I will withdraw the ruling admitting No. 3 in evidence and let you argue to the jury that the Court refused to receive [it] in evidence." The prosecutor said, "I can get something heavy"—to block out the accompanying material. By his persistence the prosecutor persuaded the trial judge to overcome his doubts.

The probability that Government Exhibit 3 impressed upon the jury the fact of appellant's prior criminal record is too substantial for us to ignore. We find prejudicial error requiring a new trial.[8]

Reversed and remanded.

---

6. Palmer v. Peyton, 4th Cir., 359 F.2d 199 (en banc), April 6, 1966.

7. In this case, as already noted, it was in the hearing of the jury that the prosecutor presented the photographs to the witness, asked her to identify them, and offered them in evidence. At that point

the court called for a bench conference, but the jury's awareness was by then beyond recall.

8. See Leigh v. United States, *supra* note 1.

PRETTYMAN, Senior Circuit Judge (dissenting):

The Per Curiam initially released by the court does not indicate the point actually involved in the controversy. The "fuller statement" defines the question and discusses it. I disagree with the decision and also with the opinion. I first discuss the former.

This affair should be painted with broad strokes and primary colors. Guilt was clear beyond a scintilla of doubt. The action occurred in broad daylight on a traveled street in the city. It was observed by an intelligent and totally disinterested witness. The controversy revolves about maneuvers of counsel at the trial.

The facts are plain and simple. On a mid-August afternoon a Mrs. Strube, housewife, resident on Juniper Street near 14th, heard a car stop in front of her house. She looked out to see if she had a visitor. She saw a man go up the steps of the house across the street. Knowing these neighbors to be away she watched. Presently two men came out of the house carrying a sofa. They put the sofa in their car. Mrs. Strube, evidently a lady of spirit and spunk, went out into the street and made inquiry of one of the men. He swung a fist at her face. She blocked the blow with her elbow, and he jumped into the car and drove off. Her twelve-year-old son, seeing the assault, noted the license number of the car and called it to his mother, who jotted it down. A neighbor called the police, and two uniformed officers arrived in a few minutes. Mrs. Strube gave them a verbal description of the man whom she had addressed. A few minutes thereafter two detectives arrived on the scene, and they showed Mrs. Strube a picture of an automobile, a picture of a man standing, and two pictures on a single mat, one a full-face and one a profile. Mrs. Strube identified the picture of the car as the one involved in the incident and all three of the other photographs as being of the man who had struck at her.

When the trial was called, but before it began, the judge raised a question as to the photographs. The application for the warrant had recited that the witness had identified the suspect from a photograph. The judge said he had frequently had the problem and wished he might get a case which would take it to the appellate court and get it settled. The prosecutor said, "I am not going into that," but defense counsel said the judge would get his wish in the pending case: "You are going to get it in this case." Thus the stage was set; all the actors were aware of the probable course of the drama.

Mrs. Strube was called as a witness. She testified to the events concerning the sofa and the assault. She identified at counsel table the man who carried one end of the sofa and who had struck at her. Her testimony was simple, direct and graphic. She identified the photograph of the automobile and said it had been shown her "outside of my house." She did not say who showed her the picture. She said she gave the police a description of the man she saw walking up the steps across the street. She pointed out appellant Barnes as the man. With her statement that a neighbor called the police her direct examination ended. She had made no mention of any photographs of Barnes. Pictures of the man were no part of the prosecutor's case.

On cross-examination counsel for the defense (that is, for Barnes), after a bit of immaterial trivia (some twenty pages of transcript), asked for a bench conference and told the judge that unless ordered otherwise he was going to develop all the conversations between Mrs. Strube and the police officers, including "what, if anything, they did to assist her in identification." The judge said the witness would tell about the pictures. Defense counsel said "Yes." The court said counsel would have to complete his examination "whatever way you want to do it; then we will see what happens." Counsel then asked Mrs. Strube whether she was asked any questions by the police

which assisted her in her identification of the suspect. She said, "No, they didn't ask me any such questions." Counsel asked whether she was given any information by the police designed to assist her in her identification. She said, "They did not give me any verbal information." Counsel persisted: "Did they give you any information of any nature whatsoever?" The witness evidently hesitated, as the record shows the court said "You may answer that." Mrs. Strube then said, "They showed me a picture of a man, and I said that that was him." In answer to further questions by defense counsel, Mrs. Strube said there were three pictures of the same man, that the detectives arrived about five minutes after the uniformed officers and the detectives had the pictures in their car.

Thus at this point in the trial it had been established by the defense that the detectives who arrived on the scene a few minutes after the report of the affair had with them photographs of appellant Barnes. The eyewitness Strube described the suspect to the uniformed officers and, still on scene, identified his pictures to the detectives. The maneuver by the defense was a well-known and not improper one. Counsel wanted to establish that Mrs. Strube's precise and vivid identification was not original with her but was instigated by the police by means of photographs. As I see it, he succeeded in establishing that his client, Barnes, was known to and wanted by the police to such a degree that they carried with them on duty photographs of him.

Defense counsel released the witness. He left the prosecutor with a choice; he could introduce the photographs, or he could run the risk of a defense argument to the jury to the effect that the pictures were not really photographs of the accused, Barnes, but of somebody else; if they had been of Barnes, why did the prosecutor not show them to the jury? He took the former choice. I think he had a clear right to do so. I need not belabor my reasons for so thinking. They appear clearly enough in my above-given description of the case. The case does not involve indigency or illiteracy or appointed counsel. The operation had all the earmarks of a professional one. The conduct of the defense at trial was unusually skillful. The accused did not merely "open the door" to the introduction of the pictures; he persisted until he practically forced them into the record. I think he cannot successfully maintain reversible error on that account.

Two of the disputed photographs were a full-face and a profile on the same sheet. Heavy tape had been placed across the lower portion; no numbers or other striking notations were to be seen. There are some state cases upholding the admission of such pictures thus treated,[1] and there is more authority for their admission where their probative value outweighs their possible prejudicial effect.[2] In the case at bar the possible prejudicial effect of the photographs, presented after the testimony elicited by the defense, was nil. But I do not rely upon those propositions.

The precision and graphic quality of Mrs. Strube's testimony is well illustrated by the passage which occurred when she was handed the pictures while on the witness stand. She was asked two or three preliminary questions and then: "And whom did you recognize the subject depicted in Government's Exhibits 2 and 3 for identification to be?" Her reply was "The man who hit me and took the sofa from the house across the street. * * * He's sitting over here at the end of the table."

Referring now to the opinion of the court, I make two comments. (1) The

---

1. See Scott, Photographic Evidence § 658 at 558 (1942).

2. *E. g.*, Gill v. United States, 285 F.2d 711 (5th Cir. 1961).

court says: "And in due course the prosecution, pursuant to its indication before the trial began, introduced police photographs * * *." In so far as that statement intimates that the prosecutor indicated an intention to introduce the photographs, it is contrary to the record as I read it. And in so far as it intimates that the prosecutor introduced the photographs as part of his prosecution, it is contrary to the record. The prosecutor said flatly before trial that he was not going into the matter of identification by photographs, and, to my way of thinking, the conclusive proof of what he intended is the fact of what he did; he did not present the pictures in his case. Moreover he specifically refused to say in advance what he intended to do, and the court specifically declined to require him to do so. He presented the photographs in rebuttal after the defense had established that the witness had identified Barnes from photographs which the police had with them when they arrived at the scene of the robbery a few minutes after its occurrence.

(2) The court says the "mug shots" revealed the existence of a criminal record on the part of Barnes. In a sense this is true, but to the lay public these "shots" show a man *wanted* by the police, not necessarily one convicted. The defense in this case proved that Barnes was wanted by showing that the officers carried pictures of him with them in their car. The actual photographs added nothing to that proof. As the court so aptly says, the pictures give rise to the inference that the person involved has been in trouble with the police. I submit the fact the police carried pictures of Barnes with them while on duty conclusively gives rise to that inference. I think there is no additional prejudice in the pictures themselves.

I would affirm.