Richard L. CLARK, Appellant,

v.

UNITED STATES, Appellee.

No. 90–CF–1081.

District of Columbia Court of Appeals.

Argued Feb. 24, 1993.
Decided Nov. 10, 1993.
Rehearing Denied April 19, 1994.

Robert Wilkins, Public Defender Service, with whom James Klein, Elizabeth Taylor, and Samia Fam, Public Defender Service, Washington, DC, were on the brief, for appellant.

Stephen J. Pfleger, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, John R. Fisher and Thomas C. Black, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN and KING, Associate Judges, and MACK, Senior Judge.

FERREN, Associate Judge:

A jury convicted appellant Richard Clark of three counts of assault with intent to commit robbery while armed, one count of mayhem while armed, one count of possession of a firearm during a crime of violence, and one count of carrying a pistol without a license. See D.C.Code §§ 22–501, –506, –3202, –3204 (1989 & 1992 Supp.). Appellant challenges his convictions, alleging that the trial court erred in (1) failing to grant a mistrial after government witnesses implicated appellant in "other crimes"; (2) excluding a photo array proffered by the defense; and (3) failing to instruct the jury properly on the elements of mayhem. We conclude that none of these alleged errors requires reversal of appellant's convictions.

Appellant also argues that his convictions on two of the three assault counts

should be vacated because his alleged conduct, though directed toward three persons, only constituted a single assaultive act. *See Joiner v. United States,* 585 A.2d 176, 178 (D.C.1991). Because the government correctly does not contest this claim,[1] we remand this case to the trial court to vacate two of the assault convictions and to resentence appellant.

## I.

Appellant's convictions are attributable to a shooting and attempted robbery that took place in front of 2641 Birney Place, S.E., on the evening of January 3, 1990. According to the government's evidence, the shooting victim, Corrine Fereno, had agreed to drive her boyfriend, Robert Cogswell, to Birney Place in order to purchase PCP from Kevin Carter. En route they picked up Jerry Tudge, a friend of Cogswell's. Cogswell sat in the front passenger seat, Tudge sat in the rear, and Fereno drove. Once they arrived at 2641 Birney, they asked a woman on the street to contact Carter. Carter emerged from 2641 Birney, briefly discussed the sale with Cogswell, and went back into his apartment. Just as Carter returned from the apartment building, appellant approached the car from the front passenger side, drew a pistol, and stuck it through the partially opened passenger side window, threatening to shoot Fereno and demanding that Fereno, Cogswell, and Tudge give him their money. Cogswell grabbed appellant's arm and told Fereno to drive away. Appellant managed to free his arm, however, and shot Fereno in the chest, paralyzing her from the waist down. Cogswell then drove the car, from the passenger seat, to the nearest police station. Cogswell, Tudge, Fereno, and Carter all testified to essentially the same version of these events.[2]

Cogswell, Fereno, and Carter identified appellant at trial as the shooter. In addition, Carter identified a photo of appellant as the shooter, and both Cogswell and Fereno picked out appellant's photograph from a photo array. Cogswell identified appellant's photo without hesitation. Fereno had some difficulty identifying her assailant when she initially saw the photos one by one; she said that two of the first three photos—neither of which portrayed appellant—might have been the shooter. When she viewed the photos all together, however, Fereno picked out appellant, saying "I can't be absolutely positive, I think this is the guy." The defense presented no witnesses.

## II.

■ Appellant contends that the trial court erred in failing to declare a mistrial after government witnesses made statements that allegedly constituted "other crimes" evidence subject to the exclusionary rules of *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). Specifically, appellant cites three remarks by Kevin Carter. First, Carter said that when he gave appellant's name to police, Detective Hayes "knew exactly who I was talking about." Second, Carter said that he "guess[ed]" another detective "went into the files" to retrieve appellant's photo. Third, on cross-examination by defense counsel, Carter stated that Detective Hayes "has arrested so many people on the block and by Little Richard [appellant's street name] had been incarcerated I just assumed that maybe he knew his last name." Finally, appellant cites Fereno's testimony that the photo array police showed her included "front and side views."

Assuming, for the sake of argument, that these four statements constituted "other crimes" evidence, we conclude that they did not result in prejudice so great as to render the trial court's refusal to grant a mistrial an abuse of discretion. *See Beale v. United States,* 465 A.2d 796, 799 (D.C.1983) (decision on whether a mistrial should be declared has always been committed to the sound discretion of the trial court and as such, on appeal,

---

1. The government did not address this issue at all in its brief and conceded the point at oral argument.

2. Cogswell and Tudge testified pursuant to a grant of immunity. Carter agreed to testify as part of an agreement in which he pled guilty to possession of PCP with intent to distribute (based upon a later attempted sale), and the government agreed not to charge him in connection with the shooting.

a decision should be reversed only in extreme situations threatening a miscarriage of justice), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984).

We have recognized that "[t]he risk from the admissibility of a prior arrest of the defendant is that 'the jury may infer from the prior criminal conviction that the defendant is a bad [person] and that he [or she] therefore probably committed the crime for which he [or she] is on trial.'" *Bennett v. United States,* 597 A.2d 24, 27 (D.C.1991) (quoting *Fields v. United States,* 396 A.2d 522, 527 (D.C.1978)). The danger of such an improper inference is much less, however, where the evidence of "other crimes" is largely speculative and thus weak, as it was in this case. The three statements given by Carter and Fereno during the government's direct examination implicated appellant in prior criminal acts so indirectly, if at all, that "the jury would have had to engage in speculation in order to make any improper use" of them. *(Michael) Sweet v. United States,* 449 A.2d 315, 319 (D.C.1982). *See also Sellman v. United States,* 386 A.2d 303, 307 (D.C. 1978) ("we will not reverse where improperly admitted evidence requires the jury to speculate [in order to reach the conclusion] that the defendant has committed other crimes"). Neither Fereno's statement that the photo array contained "front and side views," nor Carter's remark that he "guess[ed]" a detective had retrieved appellant's photo from the files, necessarily suggested that appellant had been arrested previously. *See Shuman v. United States,* 243 A.2d 900, 901 (D.C. 1968) (testimony that detective had called to say that police might have defendant's photo provided "little reason to speculate that the jury must necessarily have inferred ... that appellant had a prior criminal record," where photo was not otherwise identified or admit-ted in evidence); *Packard v. United States,* 77 A.2d 19, 21 (D.C.1950) (statement by police officer that he did not know defendants but had pictures of them was "altogether too vague and tenuous a ground on which to predicate a reversal," since appellant court had "no way of knowing what meaning the jury drew from the officer's statement"). Thus, on numerous occasions this court has found that the mere mention of pretrial identification procedures involving police photographs did not, in itself, so prejudice defendant as to require reversal.[3] Similarly, Carter's statement that Detective Hayes knew appellant did not necessarily implicate appellant in any criminal activity. *See Bean v. United States,* 576 A.2d 187, 188 n. 2 (D.C. 1990) (no merit to appellant's claim that police officer's testimony that he was able to identify defendant because of previous "official" encounter constituted "other crime" evidence).

Carter's statement that appellant had previously been incarcerated is more problematic, because it squarely—albeit briefly—set before the jury the information that appellant had previously been arrested, or perhaps even convicted. We note, however, that insofar as there was no evidence as to what crime may have resulted in appellant's supposed incarceration, the risk of an improper inference of guilt by the jury was less than in the situation where "the crime charged and the prior arrest involve the same offense." *Bennett,* 597 A.2d at 27 (citation omitted). Moreover, a reference to a defendant's prior arrest or imprisonment does not necessarily require a mistrial. *See Goins v. United States,* 617 A.2d 956 (D.C.1992) (no abuse of discretion in refusal of mistrial after detective testified unexpectedly that defendant had a criminal record); *(Michael Ronald) Sweet v. United States,* 438 A.2d 447, 453

---

3. We emphasize again that the photographs themselves were never introduced at trial. That fact distinguishes this case from *Williams v. United States,* 382 A.2d 1 (D.C.1978), and *Barnes v. United States,* 124 U.S.App.D.C. 318, 365 F.2d 509 (1966), both of which found prejudice in the actual admission of police "mug shots." *Compare Sheffield v. United States,* 397 A.2d 963, 965 n. 1 (D.C.) (police officer's reference to photos of appellant shown to witnesses as "MPDC identification photos" did not constitute reversible er-ror), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1071 (1979); *Wilson v. United States,* 357 A.2d 861, 863–64 (D.C.1976) (references to photo array from which appellant was identified did not require mistrial, where photos themselves were not admitted in evidence or described as "mug shots"); *Shuman,* 243 A.2d at 901; *Packard,* 77 A.2d at 21; *see also United States v. Alston,* 157 U.S.App.D.C. 261, 263, 483 F.2d 1264, 1266 (1973).

(D.C.1981) (trial court did not abuse discretion in failing to declare mistrial where co-defendant testified that appellant had been in jail); *Austin v. United States,* 433 A.2d 1081, 1085 n. 5 (D.C.1981) (mistrial unwarranted despite testimony that appellant was going "to meet his parole officer"); *Hardy v. United States,* 119 U.S.App.D.C. 364, 365, 343 F.2d 233, 234 (1964) (per curiam) (no abuse of discretion in trial court's denial of mistrial, despite witness's statement that he had done "time in the penitentiary" with appellant), *cert. denied,* 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed.2d 276 (1965).

■ In further determining the degree of prejudice to appellant from these statements, we

> must assess the gravity of the misconduct, the relative strength of the government's case, the centrality of the issue affected, and any mitigating actions taken by the court, all the while giving due deference to the decision of the trial judge, who had the advantage of being present not only when the alleged misconduct occurred, but throughout the trial.

*Bennett,* 597 A.2d at 27 (quoting *Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989)).

We note, first, that the government does not appear to have committed any misconduct in this case. On the contrary, the record indicates that the government did not deliberately elicit these statements and that they surfaced despite the government's warnings to Carter and Fereno not to touch on appellant's previous contacts with police or to imply that the photo array consisted of "mug shots." Indeed, the most damaging remark, referring to appellant's prior incarceration, came out during defense counsel's cross-examination of Carter, rather than during the government's direct examination of this witness.

Second, while the challenged statements relate to the central issue of identification, the government also had a very strong case on this point, since it presented both in-court and out-of-court identifications by three eye-witnesses.

■ Third, on several occasions the trial court offered to give curative instructions to make clear to the jury that neither police photos of a defendant nor prior incarceration are evidence of guilt. Defense counsel consistently rejected these offers. We acknowledge that, "in the face of seriously prejudicial evidence, curative instructions, particularly those buried within the charge-in-chief at the end of trial, are of minimal worth." *Williams,* 382 A.2d at 7 (citation omitted). Moreover, we recognize that there are situations where, as a matter of strategy, defense counsel may decide that it is more effective simply to let a potentially prejudicial remark pass, rather than drawing attention to it further by requesting a curative instruction. But where a defendant asserts that certain testimony is so prejudicial as to require a mistrial, yet refuses any curative instruction, we will still consider whether a curative instruction was available that might have mitigated the alleged harm to the defendant's case. *See Beale,* 465 A.2d at 799; *Hardy,* 119 U.S.App.D.C. at 365, 343 F.2d at 234. On this record, we believe that appropriate instructions to the jury could have significantly minimized any possible prejudice to the appellant from these statements. *See Goins,* 617 A.2d at 959; *Beale,* 465 A.2d at 799; *(Michael Ronald) Sweet,* 438 A.2d at 453; *Shuman,* 243 A.2d at 901; *Packard,* 77 A.2d at 21.

In sum, three of the four challenged statements provided, at worst, merely speculative evidence of appellant's possible involvement in other crimes; the reference to appellant's prior imprisonment was brief, inadvertent, and non-specific; there was no government misconduct involved in any of these statements; the government's case was strong; and defense counsel refused curative instructions that could have mitigated the prejudice to the defendant. Under these circumstances, and bearing in mind the precedents cited above, we conclude that the trial court did not abuse its discretion in refusing to declare a mistrial.

### III.

#### A.

In its case-in-chief, the government sought to introduce the photo array from which

Cogswell and Fereno identified appellant, in order to show the jury the similarity of the photos and thus to explain why Fereno had mistakenly identified two other individuals when she first viewed the photos one at a time. Defense counsel objected, citing *Barnes v. United States*, 124 U.S.App.D.C. 318, 365 F.2d 509 (1966) (per curiam), and the court arranged a compromise: the photos themselves would not be admitted, nor would Fereno be allowed to say that the photos showed front and side views, but the court would allow testimony that the photos showed two views and looked similar.[4]

During cross-examination of the government's penultimate witness, Detective Melillo, defense counsel asked the detective whether he remembered what the particular persons in the photo array looked like. At that point, the trial judge warned defense counsel that, if she persisted in this line of questioning, he would allow the government to introduce the photo array. Defense counsel proceeded to ask the detective general questions about his practice in putting together a photo array but did not question him further about the characteristics of this particular array.

After the government had rested its case, however, defense counsel reversed her position and tried to introduce the photo array, asserting that it would help to discredit Fereno's identification because it would reveal that, in fact, the photos were not alike. Defense counsel defended this change in her position by saying that, because of the statements as to "other crimes" cited above, see *supra* Part II, the jury was sure to know that the photos were mug shots whether they were admitted or not, and so their admission would not further prejudice appellant's defense. The trial judge denied the motion,

saying "I am not going to do it in view of the procedure that we set forth and you agreed to." Appellant contends that this denial violated his constitutional right to present a defense.

### B.

■■■ "It is well settled that '[t]he determination[ ] to admit photographs as demonstrative evidence is within the trial court's sound discretion.' " *Rogers v. United States*, 483 A.2d 277, 291 (D.C.1984) (quoting *(Larry) Brown v. United States*, 464 A.2d 120, 123 (D.C.1983)), *cert. denied*, 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985). However, "[t]he discretion generally vested in the trial court with respect to the admissibility of evidence must be weighed against the constitutional rights of a defendant to confront witnesses and to present a defense." *Bassil v. United States*, 517 A.2d 714, 716 (D.C. 1986) (citation omitted). Accordingly, when we review challenged evidentiary rulings to determine whether the trial court abused its discretion, the test for harmless error—which is an element of our review for abuse of discretion[5]—will vary depending upon whether or not the defendant's constitutional rights were infringed. Where, for example, the trial court's evidentiary ruling wholly deprived the defendant of any opportunity to cross-examine a witness or present evidence concerning bias or a central issue in the case, we may only affirm if we are convinced that the error was harmless beyond a reasonable doubt, applying the test set forth in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).[6] *See Scull v. United States*, 564 A.2d 1161, 1166 (D.C. 1989); *Bassil*, 517 A.2d at 716 & n. 4; *see generally White v. United States*, 613 A.2d

---

4. Defense counsel and the court would have been willing to permit the introduction of cropped, frontal shots alone, as long as there was no additional testimony about there being other views or side views, but the government declined this offer.

5. *See Johnson v. United States*, 398 A.2d 354, 366 (D.C.1979) (in deciding whether trial court abused its discretion, appellate court "must ask, having found error, is it of a magnitude to require reversal") (emphasis omitted).

6. Of course, certain "structural defects" in the trial process, "such as the total deprivation of the right to counsel at trial or a judge who is not impartial," undermine the rights of the accused so fundamentally that they "defy analysis by harmless error" and require per se reversal. *White v. United States*, 613 A.2d 869, 874 (D.C. 1992) (en banc) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991)).

869, 874 (D.C.1992) (en banc) (describing tests for reversible error).

■ Not every evidentiary decision of the trial court, however, necessarily implicates the defendant's constitutional right to cross-examine witnesses and present a defense. "[T]he Confrontation Clause ... guarantees a defendant only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *Reynolds v. United States,* 587 A.2d 1080, 1085 (D.C.1991) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); emphasis in original) (trial court did not commit reversible error in prohibiting cross-examination on collateral issue, where counsel could not proffer good faith basis as to its relevance). If the issue is merely collateral, or where ample cross-examination has already been allowed or evidence admitted on a particular issue, trial court curtailment of the defendant's presentation does not implicate the defendant's Sixth Amendment rights, and we apply the less stringent test for harmless error set forth in *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). *Compare Scull,* 564 A.2d at 1166 (applying *Chapman* test in assessing denial of any opportunity to cross-examine key government witnesses for bias) *and Bassil,* 517 A.2d at 716–17 (applying *Chapman* test to exclusion of all defense testimony as to bad reputation of government witness for truth and veracity) *with Roundtree v. United States,* 581 A.2d 315, 328 & 329 n. 34 (D.C. 1990) (applying *Kotteakos* test to ruling excluding as irrelevant evidence concerning condition of alleged rape victim's genitalia) *and Parks v. United States,* 451 A.2d 591, 610 & n. 37 (D.C.1982) (applying *Kotteakos* test to erroneous exclusion of cumulative evidence that would have indirectly impeached government witness's out-of-court identification), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983).

■ In the circumstances of this case, we believe that the trial court's decision to exclude the photo array, like the evidentiary rulings at issue in *Roundtree* and *Parks,* did not offend the defendant's right to cross-examine witnesses and present a defense. Defense counsel had ample opportunity to question all witnesses, including Fereno, about Fereno's out-of-court identification of appellant through the photo array. Moreover, as we discuss further below, defense counsel rejected admission of the array on two occasions. Accordingly, we apply the *Kotteakos* test for harmless error in reviewing the trial court's ruling for abuse of discretion.

### C.

In exercising its discretion, the trial court may on *occasion* be *confronted* with situations such as this where defense counsel reverses position, arguing for the admission of evidence to which she or he previously objected. We are reluctant to endorse a hard and fast rule of estoppel in such a situation, recognizing that the circumstances of a case evolve as it is tried. Moreover, we are wary of the danger that an estoppel rule might result in overly broad and harmful applications. As we observed in *Scull,* 564 A.2d at 1166:

> There is no rule compelling trial courts to exclude defense evidence on the basis of wholly distinct evidentiary limitations imposed to protect the defendant.... [A] ruling granted to protect the defendant from incriminating associations should not be used to prevent him [or her] from showing the unreliability of government witnesses, and a ruling for his [or her] benefit should not be allowed to have an unforeseen adverse impact on his [or her] defense.

At the same time, we are also mindful of the fact that, in managing a trial, a judge must make a multitude of decisions about the admissibility of evidence. If all of these decisions were subject to revision at the behest of one party or the other, with all the attendant complications of remedying any prejudice that might result from such changes, the trial process might well degenerate into an interminable chaos. Accordingly, we are unwilling to say that a trial court may never hold defense counsel to previous objections that have served as the basis for an evidentiary

ruling.[7]  *See March v. United States,* 362 A.2d 691, 696 (D.C.1976) (upholding trial court's restrictions on cross-examination of government witnesses, where court initially imposed restrictions in response to defense counsel's pretrial motions); *United States v. Dworken,* 855 F.2d 12, 33 & n. 23 (1st Cir. 1988) (holding that defendant's original consent to exclusion of all audiotapes estopped him from objecting to trial court's exclusion of audiotape proffered by defense).

■ In deciding whether, in a particular case, the trial court has abused its discretion in excluding defense evidence on the basis of a previous defense objection to the introduction of this evidence, we will consider a variety of factors: whether the proffered evidence was actually identical to the evidence that defense counsel previously objected to; whether defense counsel was ever given the option of having the evidence admitted after his or her initial objection; how late in the trial defense counsel changed her or his position; whether new circumstances justified this change, or whether, instead, the change was due only to a shift in trial strategy; whether defense counsel had sufficient opportunity to examine witnesses on the point for which she or he sought admission of the excluded evidence; whether comparable evidence was introduced by other means; the relevance of the proffered evidence and the likelihood that it would have sustained the point for which it was offered; the degree of prejudice to the defendant's case posed by either admission or exclusion of the evidence; and the potential for prejudice to the government. *See Scull,* 564 A.2d at 1166; *March,* 362 A.2d at 696.

On examining these factors, we conclude that, under the particular circumstances of this case, the trial court did not abuse its discretion in excluding the photo array. In contrast with *Scull,* see *supra* note 5, here defense counsel sought to introduce the same item of evidence to which she had previously objected.[8]  When defense counsel first objected to the introduction of the photos, she argued that they would be particularly prejudicial given Carter's previous statements that appellant had been imprisoned, that police knew appellant, and that he guessed they retrieved appellant's photo from their files. See *supra* Part II. During her cross-examination of Detective Melillo, defense counsel was again given the choice of having the photos admitted, which she declined. Only after the close of the government's case-in-chief did defense counsel change her position. Defense counsel then argued, contrary to her earlier claims, that appellant would not be further prejudiced by the admission of the photo array because, by this point in the trial, the jury already knew that the photos were mug shots. This argument, however, was misleading, for Carter—who was responsible for three of the four allegedly prejudicial statements—had already testified when the court first ruled on the admissibility of the array. At the time defense counsel changed her mind about admissibility, the only new item of potentially prejudicial testimony she cited was Fereno's brief statement that the photos showed front and side views. We therefore conclude that counsel's change in position was primarily due to a tactical shift, not to surprising new evidence.

We note, further, that defense counsel had ample opportunity to cross-examine the government witnesses about the similarity or dissimilarity of the photos in the array. On our review of the array, we seriously doubt whether viewing the photos themselves would have led the jury to question the testimony of Fereno and Detectives Melillo and White that the photos looked very similar. Indeed, we believe that the potential preju-

---

7. We note that in *Scull* the trial court erred in yoking together two types of evidence that were, in fact, "facially distinct." *Id.* In that case, the trial court had granted defendant's motion to exclude references to the prevalence of drug sales at the crime scene. The trial court then relied on this ruling in denying defendant the opportunity to cross-examine two government witnesses about their own involvement in drug sales. In this case, by contrast, the trial court was dealing not with two "facially distinct" top-

ics of testimony, but only with a single item of evidence: the photo array.

8. Although defense counsel did say that she would accept the admission of cropped, frontal views only, see *supra* note 4, she argued generally for the exclusion of the array as a whole and gave no indication that she might later wish to introduce any of the photos.

dice to appellant from admission of the photos would have largely counterbalanced any advantage that might have been gained from their admission. Moreover, even if introduction of the array would have served to discredit Fereno's identification to some extent, the jury still had before it the identification testimony of both Cogswell and Carter. Thus, we can say, "with fair assurance, after pondering all that happened without stripping the [allegedly] erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 765, 66 S.Ct. at 1248.

In sum, we conclude the trial court did not abuse its discretion in refusing to admit the photo array in evidence when defense counsel changed her position on admitting that evidence after the government had completed its case-in-chief.

## IV.

■ Finally, appellant alleges that the trial court committed plain error in failing to instruct the jury that, in order to convict appellant of mayhem, the government had to prove that appellant had the specific intent to maim. The relevant statute, D.C.Code § 22–506, does not define the crime of mayhem. All of the relevant caselaw in this jurisdiction, however, indicates that mayhem remains a general intent crime, as it was under common law. *See (George) Brown v. United States*, 84 U.S.App.D.C. 222, 223, 171 F.2d 832, 833 (1948) ("[S]o long as the act of mayhem is done maliciously and wilfully, a specific intent is not necessary to constitute the crime. The common law definition applies, and it does not include a specific intent."); *see also Edwards v. United States*, 583 A.2d 661, 663 (D.C.1990); *Wynn v. United States*, 538 A.2d 1139, 1145 (D.C.1988); *Perkins v. United States*, 446 A.2d 19, 26 (D.C.1982) (per curiam); *Bridgeford v. United States*, 411 A.2d 633, 635 n. 4 (D.C.1980). In light of these statements, we can hardly say that the trial judge committed plain error in·not including specific intent to maim as an element of the offense.

Because the government does not contest appellant's claim that his convictions on two of the three assault counts should be vacated,

see *supra*, we remand this case to the trial court to vacate these convictions and to resentence appellant. In all other respects we affirm the judgment on appeal.

*So ordered.*

MACK, Senior Judge, dissenting:

In the recently decided case of *In re R.H.M.*, 630 A.2d 705 (D.C.1993), this court reversed an adjudication of delinquency because the evidence was insufficient to identify the defendant as the perpetrator of the crime. The authoring judge of the court's opinion noted an interesting statistic; this was only the second such case since *Crawley v. United States*, 320 A.2d 309 (D.C.1974) (decided almost twenty years ago) to reverse on these specific grounds. Although the defense of mistaken identity is asserted in a vast number of criminal cases, it is well-nigh axiomatic that identification by one eyewitness is sufficient to support a conviction. *See In re B.E.W.*, 537 A.2d 206, 207 (D.C.1988). Yet in numerous seminars and training sessions for lawyers and judges alike, experts have demonstrated, time and time again, the potential fallibility of eyewitness identifications.

To the extent to which the issue before us now is about identity at all, it is about the quality—not the quantity—of identification testimony. It is about the quality of cross-racial identification and the exclusion of a photo array that would have thrown light on that quality. Thus, at trial, the government, faced with the fact that the victim of the shooting had initially identified the photos of two men other than Mr. Clark as the assailant, sought to minimize the impact of the difficulty by introducing testimony that in the "mug" photo array "all these people looked alike." The defense, after having initially objected to the introduction of the mug shots for the obvious traditional reason, thereafter sought to introduce the photo array as evidence to show that all of the men did not look alike. The government did not oppose this request. The trial court, however, ruled that the evidence must be excluded for reasons that the government does not

attempt to defend at the appellate level.[1] It is the exclusion of this photo array that appellant points to as constituting an error affecting a central issue at trial. I agree with this position. I also agree that this exclusion could not have been harmless error. As appellant's counsel succinctly argued before this court, if only one of twelve jurors, after looking at the photo array, had been left with a reasonable doubt as to the reliability of identification, counsel would not have been before the appellate court.

Today my colleagues correctly point out that the discretion generally vested in the trial court with respect to the admissibility of evidence must be weighed against the constitutional rights of a defendant to confront witnesses and to present a defense. *See Bassil v. United States,* 517 A.2d 714, 716 (D.C.1986). However, their disposition of this case does not reflect the recognition that the inherent component of the Sixth Amendment right to confrontation can only yield to such discretionary judicial exercise as may be necessary to prevent such tactics as the harassment and humiliation of witnesses, prejudice, confusion of issues or repetitive, cumulative or marginally relevant questioning. *See Scull v. United States,* 564 A.2d 1161, 1164 (D.C.1989). Here the trial court's exclusion of the photo array has deprived appellant of the right to challenge critical testimony going to a central issue—identification. The alleged unreliable testimony of a witness is never a collateral issue, even if extrinsic (which it was not here) to issues raised on direct examination. *Id.* at 1165. The photo could not have confused the issues, or humiliated the witnesses and, being "the best evidence" to challenge reliability could not be termed to be cumulative, repetitive or marginally relevant. My colleagues, apparently in conceding that exclusion was error have termed the error "harmless," relying in large measure upon the fact that at trial defense counsel reversed her position as to the admissibility of evidence previously objected to—an approach, which when aired at oral argument, drew the suggestion from appellant's counsel that his client, because of

the prosecutor's tactic, had been confronted with a "Hobson's Choice." I take solace in the fact that my colleagues are reluctant to endorse a hard and fast rule of estoppel as against a defense counsel who has reversed a position at trial, but I am deeply distressed at their establishment of criteria for defense counsel by which the Sixth Amendment right of his or her client is to be judged. The error of exclusion, if any, is that of the trial judge. The trial court's ruling here cannot survive the test of harmlessness. There is no rule compelling a trial court to exclude defense evidence on the basis of wholly distinct evidentiary limitations imposed to protect the defendant; a ruling granted to protect a defendant should not be used to prevent him or her from showing the unreliability of a witness. In order to affirm such a ruling as harmless, we must be satisfied that an appellant *would* have been convicted, not that he *could* have been convicted. *Id.* at 1166.

Turning to the circumstances here, one needs no explanation as to why defense counsel initially objected to the introduction of mug shots into evidence. She changed her position only after the government introduced evidence to the effect that all of the men in the photo array looked alike (in an effort to bolster the questionable identification by the victim) and after the need for the exclusion of the photo had dissipated because of volunteered improper statements by government witnesses that tied appellant to criminal activity. Before this court, the government, which did not object at trial to the admission of the photo, now argues that admission would have been prejudicial to the government and would not have helped in any event.

I find it difficult to conclude that the admission of the photo would not have helped the defense. Even without viewing the array, I cannot accept as a foregone conclusion that not one juror, viewing the array and taking the oath seriously could have simply

---

1. The trial court justified its ruling on the grounds that (1) another trial court had, on a motion to suppress, rejected the argument of suggestivity, and (2) that the parties had agreed to exclude the photo.

dismissed the misidentifications as irrelevant beyond a reasonable doubt.

As appellant's counsel argued before us, this case is about cross-racial identification in the following context:

Into a black urban crime setting a white victim drives her boyfriend to purchase drugs from a black supplier who was not Mr. Clark (whom she initially had difficulty identifying). The other identifications are made by the white boyfriend who used the black supplier to identify appellant as the assailant, and the black supplier who is arrested, allegedly beaten, charged with the crime, and given immunity for his testimony against appellant. *See Scull, supra,* 564 A.2d at 1167 (plausible that a jury would have discredited testimony of government witnesses if appellant had been allowed to impeach them as biased by their perceived need to curry favor with the government to protect their own liberty interests).

To this extent, at least, the government's case was not a strong one and identification became a critical issue. Misidentification could have influenced the outcome of the trial.

Moreover, I question the government's argument at this level that admission of the photo would have prejudiced its case. As noted, the government voiced no objection at trial. It spells out no prejudice here [2] but simply assures us (at oral argument) that we can look at the photo array to determine whether its exclusion from the scrutiny of the jury was per se reversible error. The fallacy of this assurance is evident.

Finally, I strongly question whether we, as an appellate court, can adopt a viable standard of review that identifies a defense lawyer's change of evidentiary tactics as a criterion that can outweigh the right of a defendant to confront the witnesses against him.

I respectfully dissent.

---

2. Pragmatically speaking, the government is always prejudiced when it loses a criminal case. Yet the government and its client (the public) are the beneficiaries when a defendant is granted a fair trial.

Ironically here, it is appellant who candidly supplies a pragmatic reason for potential prejudice to himself and to the government. Pointing out that eleven of the twelve jurors were black, he cites studies that all people are better able to recognize and identify individuals of their own race than individuals of other races. *See* S. Johnson, *Cross–Racial Identification Errors in Criminal Cases,* 69 CORNELL L.REV. 934, 938–46 (1984) (and sources cited therein); S. Platz & H. Hosch, *Cross–Racial/Ethnic Identification: A Field Study,* 18 J.APP'D.SOC.PSYCHOL. 972 (1988) (and sources cited therein); Note, *Hearsay and Relevancy Obstacles to the Admission of Composite Sketches in Criminal Trials,* 64 B.U.L.REV. 1101, 1135 & n. 185 (1984) (and sources cited therein).