**Akande L. JOHNSON and Damon Franklin, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 05–CF–1311, 05–CF–1353, 05–CF–1444 & 05–CF–1468.**

District of Columbia Court of Appeals.

Argued Sept. 29, 2008.
Decided Sept. 17, 2009.

---

1178

Joseph E. Fluet III, with whom Robert M. Caray and Bradley J. Bondi were on the brief, for appellant Johnson.

Jenifer Wicks, Washington, for appellant Franklin.

John P. Mannarino, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., Ann M. Carroll, and Matthew P. Cohen, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and KRAMER, Associate Judges, and FARRELL, Senior Judge.*

KRAMER, Associate Judge:

Appellants Akande L. Johnson and Damon Franklin were both convicted of second-degree murder while armed with a shod foot under a theory of aiding and abetting. On appeal, Johnson argues that the trial court committed reversible error by (1) giving improper jury instructions as to aiding and abetting; (2) permitting the prosecutor to ask improper questions of a witness; (3) excluding some of Johnson's expert witness's testimony; (4) refusing to sever the joint trial from that of a third co-defendant (Walter Clark, whose appeal is not before us); (5) admitting certain hearsay statements; and (6) admitting certain photographs of the decedent. Johnson further argues that (7) his conviction should be overturned because the prosecution violated his right to *Brady* material. Franklin adopts and elaborates on all of Johnson's arguments. We affirm.

## I. Facts

The trial established the following facts. On the evening of July 12, 2003, appellants

---

* Judge Farrell was an Associate Judge, Retired, of the court at the time of argument. His status changed to Senior Judge on January 23, 2009.

Johnson and Franklin, along with their friend, Walter Clark, went to a "cabaret" at a church in Southeast Washington. In addition to appellants and Clark, a friend of appellants named Darren, along with Carl Wellman (the decedent), Wendell Wray, Alisha Glover, and her cousins Adrianne Glover and Melissa Venable, attended the cabaret. Around 2:00 am on the morning of July 13, 2003, a fight broke out during which Darren received a cut on the head. After the fight, Alisha, Adrianne, Wray, and three other people left the cabaret in a car driven by Wellman. Wellman drove to the Glovers' home. During the drive home, Alisha used Adrianne's cell phone to call Clark and tell him that she was on her way home. When Wellman pulled into the Glovers' block, a number of people were standing on the corner of 10th and G streets, including appellants, Clark, and their friend Darren, whose head was still bleeding from the fight at the cabaret. Alisha and Adrianne got out of the car.

Johnson, Franklin and Clark approached the car, and Johnson began yelling at Wellman, saying that he had been told that Wellman had hit him in the back of the head during the cabaret fight. Wellman then got out of the car, while Wray stayed in the front passenger seat. Johnson continued yelling at Wellman, and Clark punched Wellman in the face. Wellman fell to the ground, and both appellants kicked and stomped Wellman about the head and body numerous times.

Both Adrianne and Alisha witnessed the assault, and Adrianne screamed for the attackers to stop. Although Clark looked up and made eye contact with her, the appellants continued kicking Wellman. Clark pulled Franklin away from Wellman and called out to Johnson to "come on." Appellants and Clark then left the scene.

The Glovers' uncle went to assist Wellman, who was now unconscious and lying in the street. He placed Wellman in the back seat of Wellman's car. Wray then drove Wellman to Howard University Hospital, where Wellman remained hospitalized until his death approximately four weeks later on August 8, 2003. An autopsy determined that Wellman had died from blunt impact head trauma.

Adrianne testified that Franklin kicked Wellman "[p]robably like 5 or 6 times," including two kicks to the head, and, after admitting that she did not know how many total kicks Johnson inflicted on Wellman, she estimated he had done so fifteen times. Both Johnson and Franklin were wearing shoes.

## II. Jury Instructions

Both appellants argue that the court erred in giving the jury a "natural and probable consequences" instruction for aiding and abetting because our holdings in *Wilson–Bey v. United States*, 903 A.2d 818, 835–39 (D.C.2006) (en banc), *Kitt v. United States*, 904 A.2d 348, 355–56 (D.C. 2006), and *Coleman v. United States*, 948 A.2d 534, 552–54 (D.C.2008), forbid the use of the "natural and probable consequences" instruction in the context of second-degree murder. Franklin separately argues that the court erred in giving the instruction for aiding and abetting without also instructing the jury that they must find that at least one of the defendants was the principal of the crime.

### A. Natural and Probable Consequences

 In *Wilson–Bey, supra,* we held that a "natural and probable consequences' instruction erroneously 'dispenses with any requirement that the accomplice be shown to have the requisite mental state for conviction of first-degree murder, including premeditation and intent to kill.'" *Wilson–Bey,* 903 A.2d at 835. In *Coleman, supra,* we applied *Wilson–Bey's* holding so

as to invalidate the same instruction in a second-degree murder prosecution. *Coleman*, 948 A.2d at 552–53; *Fortson v. United States*, 979 A.2d 643, 658–59 (D.C.2009). Hence, it was error for the court to give the instruction in this case-an error to which appellants properly objected at trial. Nevertheless, reversal is not required if the error was harmless beyond a reasonable doubt. "Whether the instructional error was harmless beyond a reasonable doubt boils down to whether an impartial juror could reasonably conclude that [appellants] did not kill (or help to kill) the decedent with [malice]." *Wilson–Bey, supra*, 903 A.2d at 846; *Fortson, supra*, at 658.

Here, appellants do not dispute that they kicked Wellman while he was on the ground; the only dispute is as to how many times their kicks landed on Wellman's head, if at all.[1] Alisha Glover, Wendall Wray, and Adrianne Glover all testified that both appellants kicked the decedent multiple times. Thus there was strong evidence—the mutually corroborating testimony of three eye witnesses—from which to infer that appellants had the requisite *mens rea* for second-degree murder while armed with a shod foot because they intended to kill Wellman, or intended to seriously injure him, or acted in conscious disregard of an extreme risk of death or serious bodily injury to him when they were kicking him. *See Herbin v. United States*, 683 A.2d 437, 443 (D.C. 1996) (setting out the elements of second-degree murder). In these circumstances, we are persuaded that there is no reasonable possibility, *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that a juror relied on the crutch of the erroneous instruction to find malice on appellants' part.

Moreover, unlike *Wilson–Bey, supra*, the instructions here at least specified that an accomplice must know that another participant had the intent necessary for second-degree murder, *see Wilson–Bey*, 903 A.2d at 832–33, 833 n. 28, and—again unlike in that case—the prosecutor did not argue in summation that the jury did not have to find malice as to each participant to convict of second-degree murder. Thus, the error in instructing on "natural and probable consequences" was harmless beyond a reasonable doubt.

## B. Lack of a Principal

■ Franklin argues that the trial court also erred in failing to instruct the jury that the government needed to prove beyond a reasonable doubt that one of the defendants was the principal offender. Although Franklin is correct that for a defendant to be convicted as an aider and abettor, the government must prove beyond a reasonable doubt all of the elements of the underlying crime, including commission of the crime by someone else, *see In re J.W.Y.*, 363 A.2d 674, 677 (D.C. 1976), the court did not need to instruct the jury to find which of the three defendants was the principal offender because, while "there must be evidence that someone other than the defendant was the principal . . ., it is not necessary for conviction that the principal's identity be established." *Price v. United States*, 813 A.2d 169, 176 (D.C.2002). Further, the judge instructed the jury that, for aiding and abetting to apply, "the defendant [must have] . . . associated himself with the persons who committed the crime" (emphasis added), which ensured a finding by the jury that there was a "person who committed the crime" other than Franklin. Ac-

---

1. In his brief, Johnson attempts to undermine the government's evidence that he kicked Wellman in the head but does not allege that he never kicked Wellman at all. Franklin adopted and incorporated by reference all of Johnson's arguments.

cordingly, we affirm the trial court on this point.

### III. Improper Questioning

██ Appellants also argue that the trial court erred in allowing the prosecution to question Wray about his grand jury testimony and his fear of testifying, and in refusing to grant Johnson's request for a mistrial after Wray suffered an anxiety attack shortly after leaving the witness stand. We disagree.

██ We review a trial court's decision regarding the admissibility of evidence for abuse of discretion. *Gordon v. United States,* 783 A.2d 575, 583 (D.C.2001) (citing *Mercer v. United States,* 724 A.2d 1176, 1185 (D.C.1999)). "[E]vidence concerning a witness' fear tends to be extremely prejudicial because it appeals to the passions of the jury and may cause the jury to base its decision on something other than the rule of law," especially where reference to fear may suggest that the witness fears reprisal at the hands of the defendants or their associates if he or she testifies. *Murray v. United States,* 855 A.2d 1126, 1132 (D.C.2004) (quoting *Gordon, supra,* 783 A.2d at 586). Thus, "questioning and argument by prosecutors about witness fear—especially fear of the defendants on trial—must be the limited exception rather than the rule." *Id.* at 1133. Whether to order a mistrial is subject to the broad discretion of the trial court and our standard of review is deferential. *Gordon, supra,* 783 A.2d at 583. The question here is whether Wray's testimony "was substantially more prejudicial than probative and whether, looking at the totality of the circumstances, the introduction of the fear evidence resulted in a miscarriage of justice, warranting a mistrial." *Id.* at 587.

Wray testified both before the grand jury and at the appellants' trial. In the grand jury, Wray indicated that he was concerned about his safety and whether his testimony would be made public. Assured that no one would know the contents of his testimony unless he told them, Wray testified before the grand jury about what had happened. At trial, however, Wray indicated multiple times that he did not recall what he testified to at the grand jury proceeding and that he didn't know why he couldn't recall it, though he admitted recalling having gone to the grand jury proceeding itself. On the second day of his testimony, during which he continued to say that he could not remember his grand jury testimony, the government asked Wray whether Johnson was present when Wray gave his grand jury testimony, Wray said that he was "not sure." When the government asked "[d]on't you think that was something you would remember?" Wray closed his eyes and rubbed his forehead with his right hand. The government asked Wray if he was all right, and Wray said, "No. I got to go to the bathroom." Wray was excused and subsequently found on the floor of the men's room, making retching noises. He was taken to Howard University Hospital by ambulance, where he was diagnosed as having had an anxiety attack. The court denied appellants' motions for a mistrial, and Wray resumed his testimony three days later. Wray continued being unable to recall much of what he had previously testified to and again said he did not know why he couldn't recall.[2] In closing argument, the prosecutor asked the jury to consider which is more credible, what Wray "said in the grand jury when [the appellants] weren't there or what he said

---

2. The prosecutor also asked Wray whether he remembered telling him (the prosecutor) that he was concerned about testifying because he had a son.

here in court with those men sitting 15 feet away."

While we do not condone probing the depths of a witness' fear of testifying so as to cast unfounded suspicion of intimidation on a defendant, and while the prosecution's questioning could have been more circumspect with an obviously frightened witness, the prosecution's attempts to refresh Wray's recollection and the subsequent impeachment of Wray do not generally appear to have been intended to imply that the appellants threatened Wray. Rather, the government's questions seemed designed to help the jury understand "something the jury might naturally have understood anyway: that witnesses to a violent crime subpoenaed to testify in court may continue to exhibit fear of those they believe were the perpetrators." *Murray, supra*, 855 A.2d at 1135. Moreover, the government offered, and the court indicated its willingness to give, an instruction to the jury to indicate that the fear testimony went only to Wray's general fear of testifying and that the questioning should not be interpreted to mean that Wray had been subjected to specific threats, but the appellants refused the instruction. Thus, while the prosecutor's questions may have left something to be desired, all of these instances were consistent with a general inquiry into a witness' fear of testifying against people he believes are dangerous. These instances would have been more significant to our decision if they were proportionally a greater part of the record or if the government had actually referred to the defendants as having caused the inconsistencies in Wray's testimony, which it did not.

In short, because Wray's general reluctance to testify was probative of Wray's credibility as a witness at trial, especially in the context of Wray's testimony before the grand jury, and because the appellants refused a curative instruction, we cannot conclude that the trial court, looking at the totality of the circumstances, abused its discretion in determining that Wray's testimony was not substantially more prejudicial than probative, and that its admission did not result in a miscarriage of justice. *Goins v. United States*, 617 A.2d 956, 958 (D.C.1992). Accordingly, we affirm the trial court on this point.

## IV. Expert Witness Testimony Exclusion

■ At trial, Johnson sought to call Dr. Edward Friedlander to opine that Wellman likely died from injuries caused by defendant Clark punching Wellman and by Wellman's subsequent fall to the ground, both of which occurred before appellants kicked Wellman. Both appellants argue that the trial court erred in excluding this testimony because it bears directly on appellants' culpability. Even assuming, *arguendo*, that the exclusion of the defense expert was error, it was harmless under *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The probative value of Dr. Friedlander's testimony was minimal at best. First, before trial, Dr. Friedlander told the government that he had agreed with the autopsy report attributing Wellman's death to the combination of injuries, rather than to a single blow, and admitted to being unfamiliar with the facts surrounding Wellman's death. Second, Dr. Friedlander conceded that he had not even attempted to speak with the neurosurgeon who had treated Wellman throughout his nearly four-week hospitalization; that Wellman's abrasions had healed to some degree during his hospitalization; that a single impact site might be caused by several blows; and that glancing blows (rather than more direct) ones would not leave marks. In addition, Dr. Friedlander conceded at trial that there were numerous errors in his resume; that he was not a forensic pathologist or neuropathologist; that he was not

a member of any forensic pathological associations; that despite claiming to have conducted "[a]t least 20" homicide autopsies during a period ending in the mid–1990s, he had actually conducted only nine such autopsies; that he had no experience whatsoever in conducting autopsies involving homicides due to blunt head trauma; that he had been found unqualified to testify in at least two cases, including one in which he had attempted to attribute a child sex abuse victim's injuries to "diaper rash"; and that he had repeatedly given himself poor ratings regarding his judgment. Moreover, because the *actus reus* of second-degree murder under a theory of aiding and abetting is merely that the defendant, with guilty knowledge, "assisted or participated in" the commission of the homicide, *Tyree v. United States*, 942 A.2d 629, 636 (D.C.2008), even if Clark had inflicted the attack's lethal blow at the beginning of the altercation, his having done so would not negate appellants' *actus reus* of assisting or participating in the crime of second-degree murder, wherein they repeatedly kicked Wellman after Clark punched him, because that crime was not completed until Wellman's death approximately four weeks after the attack. Likewise, as noted above, there was strong evidence that they possessed the requisite *mens rea*. *See* Section II.A., *supra*. Therefore, even assuming, *arguendo*, that the trial court erred in not admitting Dr. Friedlander's proposed testimony that Wellman died due to a punch inflicted by Clark, we are able to conclude "with fair assurance, after pondering all that happened without stripping the erroneous actions from the whole, that the judgment was not substantially swayed by the error," *Rorie v. United States*, 882 A.2d 763, 776 (D.C.2005), and we thus affirm.

## V. Severance

■ Appellants also assert that the trial court erred in denying their motion for severance because the defendants presented conflicting and irreconcilable defenses. Both appellants presented evidence that defendant Clark's punch and the fall Wellman subsequently suffered caused Wellman's death, while Clark, with whom they were jointly tried, presented evidence that the appellants' kicks were to blame.

■ Generally, "when individuals have been charged together, there is a strong presumption that they should be tried together." *Mercer, supra,* 724 A.2d at 1193. Severance may be granted, however, if trying the individuals together "prejudices any party." *Mercer, supra,* 724 A.2d at 1193 (quoting *Ray v. United States,* 472 A.2d 854, 856 (D.C.1984)). To show an abuse of discretion in failing to sever a trial, the appellant must show "manifest prejudice." *Mercer, supra,* 724 A.2d at 1193. One category of manifest prejudice occurs "when the defendants offer conflicting and irreconcilable defenses so that the jury 'will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" (*James W.*) *Johnson v. United States,* 398 A.2d 354, 368 (D.C. 1979) (citing *Rhone v. United States,* 365 F.2d 980, 981 (D.C.Cir.1966)). "The mere fact that 'a defendant would have had a better chance of acquittal had he been tried alone' is not a sufficient indication of prejudice to maintain that a trial court abused its discretion by refusing to order severance." *Id.,* (quoting *Clark v. United States,* 367 A.2d 158, 160 (D.C.1976)).

Here, appellants argue that they suffered prejudice because their emphasis on Clark's punch and Wellman's resulting fall as the cause of death created conflicting and irreconcilable defenses as between appellants and defendant Clark, who presented evidence that the appellants' kicks caused Wellman's death. This argument is unpersuasive, however, because, as not-

ed above, which defendant struck the deadly blow cannot be a defense to the appellants' culpability for second-degree murder under a theory of aiding and abetting. *See* Part IV, *supra.* As such, these "defenses" are not really defenses at all, much less irreconcilable and conflicting ones, and appellants have shown no manifest prejudice on which to base a reversal. Accordingly, we affirm the trial court on this point.

## VI. Excited Utterance

■ Appellants assert that the trial court erred in admitting as an excited utterance Melissa Venable's testimony regarding a statement that Adrianne made to her. Venable testified that she had left the cabaret to meet up with a friend, who had earlier left the cabaret with Wellman and the Glovers (approximately four blocks from the murder scene). Venable testified that it would have taken her friend five to ten minutes to walk from Wellman's car to meet her. "A few minutes" after the friend arrived, Venable called Adrianne to "make sure she made it home." Venable then testified that Adrianne told her "[t]hat she just got in, [Wellman] was driving all crazy, and he just got jumped" by "the boys outside." Venable then asked Adrianne "[w]hat boys outside?" and Adrianne replied "[e]verybody outside." Venable asked her, "[w]ho is everybody?" and Adrianne answered, "Akande [Johnson], Walt [Clark] and Damon [Franklin]." Venable testified that Adrianne's voice sounded "shocked," "loud" and high-pitched. On cross-examination, Venable agreed that other than naming appellants and Clark as having jumped Wellman, Adrianne "didn't give [her] any details of who did what."

■ A spontaneous or excited utterance is a well-recognized exception to the hearsay rule. *Smith v. United States,* 666 A.2d 1216, 1221 (D.C.1995). "What constitutes a spontaneous utterance de-

pends on the facts peculiar to each case, and such utterance is admitted in the exercise of sound judicial discretion which is not disturbed on appeal unless clearly erroneous." *Lewis v. United States,* 938 A.2d 771, 775 (D.C.2007). Three factors must be established before a statement may be admitted into evidence as an excited utterance: (1) the presence of a serious occurrence or startling event which causes a state of nervous excitement or physical shock in the declarant; (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon the event and possibly invented a statement; and (3) the presence of circumstances that in their totality suggest the spontaneity and sincerity of the remark. *Id.; Smith, supra,* 666 A.2d at 1222.

■ First, appellants argue that the government failed to establish that Adrianne was in "a state of nervous excitement or physical shock" when Venable spoke to her because Adrianne later testified that she did not think Wellman was hurt "that badly." But they cite no authority for this proposition and prove no connection between Adrianne's assessment of Wellman's chances of survival and whether she would be shocked at having seen a man kicked while on the ground. Moreover, Venable testified that Adrianne's voice sounded "shocked," "loud" and "high"-pitched, traits that are associated with shock or nervous excitement. Thus, we cannot say that the court's decision that Adrianne was in the required state was clearly erroneous.

■ Second, appellants argue that the prosecution failed to establish that Adrianne made her statement within a reasonably short period of time following the attack because the record is unclear how long after the attack the statement was made. The law, however, establishes no fixed time requirement, *Lewis, supra,*

938 A.2d at 775, and the record itself constructs a time line in which the statement occurred approximately ten to fifteen minutes after the attack. Therefore, we cannot say that the court's decision that Adrianne made her statement within a reasonably short period of time was clearly erroneous.

■　　　Finally, appellants argue that the totality of the circumstances do not indicate the "spontaneity and sincerity of the remark" because Adrianne was responding to Venable's questions. The fact that a statement is made in response to a question, however, does not necessarily keep that statement from being an excited utterance. Rather, as we have noted in the context of police questioning, "the key inquiry is whether the interview conducted was more deliberative in nature than spontaneous." *Reyes v. United States*, 933 A.2d 785, 791 (D.C.2007). Indeed,

> responses to preliminary investigative questions, made while the declarant is still under the spell of the startling event, may qualify as spontaneous utterances because the questions are asked to ascertain the nature of the emergency and do not provide an opportunity for the declarant to reflect on the event or to premeditate a response.

*Id.* (citing *Nicholson v. United States*, 368 A.2d 561, 564 (D.C.1977)). Here, Venable questioned a "shocked" Adrianne about who had attacked Wellman, not for the details of the attack. As such, we cannot say that the trial court's determination that the statement was spontaneous and sincere was clearly erroneous.

## VII. Photographs of Wellman

Appellants argue that the trial court committed reversible error in admitting two photographs of Wellman because they were inflammatory and because their prejudicial effect substantially outweighed their probative value. One photograph showed Wellman from the waist up, standing in front of a barbershop, approximately four days before the assault (the "life photograph"). The other photograph was a blurry photograph of Wellman depicting the medical treatment that Wellman received after being admitted to the hospital, but not showing any visible injuries Wellman sustained (the "hospital photograph").

■　　　As a general rule, "pictures of the decedent in a murder case are admissible, in the discretion of the trial court, so long as they have some probative value and are not intended solely to inflame the jury." *Russell, supra*, 586 A.2d at 700. Even where photographs are cumulative in light of the testimonial evidence, they may still be admissible so long as their probative value substantially outweighs any prejudice from their use. *See id.;* (*William A.*) *Johnson v. United States*, 683 A.2d 1087, 1098–99 (D.C.1996).

■　Appellants argue that the photographs had no probative value and that, even if there were some probative value to them, the danger of unfair prejudice, confusion of the issues, and misleading the jury substantially outweighed that value. The hospital photograph showing Wellman's medical treatment was relevant, however, to proving the severity of Wellman's injuries, which, in turn, was relevant to proving the requisite *mens rea* of malice. *Edwards v. United States*, 767 A.2d 241, 253 (D.C.2001) (holding that "the government was entitled to use the pictures [of an 18–month old's burned body] to establish the elements of second-degree murder (*i.e.*, malice)"). Moreover, appellants conceded that the photograph was blurry and that it did not depict any visible injuries that Wellman sustained. As such, we cannot say that the trial court abused its discretion in admitting the hospital photograph.

As to the "life photograph," other than so-stating, appellants provide no explana-

tion as to why or how a picture of Wellman from the waist-up, standing in front of a barbershop, "was highly prejudicial and designed to inflame the jurors." Thus, we decline to address this argument. *See e.g., McFarland v. George Washington Univ.*, 935 A.2d 337, 351 (D.C.2007) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993) (questions raised but not argued in briefing are treated as abandoned).[3]

## VIII. *Brady*

Both appellants also argue that the government violated its obligation to disclose exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose until after he died that the Glovers' uncle (who placed Wellman in his (i.e.Wellman's) car so that Wray could drive Wellman to the hospital) had seen seven individuals assault Wellman. Franklin separately argues that the government violated its *Brady* obligation by (1) failing to disclose Adrianne's grand jury testimony that the Glovers' uncle had told her Wellman and defendant Clark were fighting before defendant Clark punched Wellman; (2) failing to preserve two phone calls made to police on non-emergency lines implicating Franklin and the Glovers' uncle in the assault; (3) failing to disclose that two of the government's trial witnesses had been under investigation by the police; and (4) failing to provide copies of call records

between Adrianne and defendant Clark until after opening statements. We disagree on all points.

 There are three components of a *Brady* violation: "(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either wilfully or inadvertently; and (3) prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). To satisfy the prejudice component, "the withheld evidence must be 'material;' that is, there must be a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 280. The omitted evidence must "create[ ] a reasonable doubt that did not otherwise exist. This means that the omission must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). If, looking at the entire record, "there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *Id.* at 112–13, 96 S.Ct. 2392.

### A. The Uncle's Statements

 The government's failure to disclose the statement of the Glovers' uncle that he saw seven individuals assault Wellman[4] did not violate *Brady*. Both appellants argue that the possible existence of other attackers is somehow exculpatory, but, as noted above, how many people

---

3. We note, however, that the "life photograph" was also relevant to proving the severity of Wellman's injuries, and therefore to proving the requisite *mens rea* of malice, because, when viewed alongside the hospital photograph, the "life photograph" provided a comparison between Wellman's condition both pre-and post-attack. *See Edwards, supra*, 767 A.2d at 253.

4. The government points out in its brief that it did disclose this information on July 14, 2004, but without giving the uncle's name. Specifically, it informed trial counsel, "The government is aware of two witnesses who, in addition to seeing the three charged defendants beating and kicking [Wellman], also saw other unidentified individuals participating in the beating. Of these two witnesses, one has not

attacked Wellman or who was the principal of that attack is irrelevant to the appellants' culpability under a theory of aiding and abetting. Moreover, appellants make no showing of how the information could have been used for impeachment purposes. Adrianne's testimony clearly indicates that additional people were present at the time of the attack. Accordingly, the uncle's statements do not create a reasonable doubt about the appellants' guilt when evaluated in the context of the entire record.

### B. Two Non–Emergency Line Phone Calls

 Contrary to Franklin's argument, the government's failure to preserve two phone calls made to the police on non-emergency lines implicating Franklin and the Glovers' uncle in the assault does not violate *Brady*. As we explain above, the calls cannot be exculpatory because how many people attacked Wellman or who was the principal of that attack is irrelevant to the appellants' culpability under a theory of aiding and abetting. *See* Parts II.B. and IV., *supra*. Moreover, Franklin's argument that the failure to preserve the "two phone calls in August 2003 implicating Damon Franklin in the assault" violated his rights because the information is "exculpatory" defies logic.[5]

### C. A "Fight" between Defendant Clark and Wellman

 Nor does the government's failure to disclose Adrianne's grand jury testimony that her uncle had told her Wellman and defendant Clark were fighting before Clark punched Wellman violate *Brady*. Franklin argues that this evidence potentially raises self-defense issues about which Franklin was entitled to know, but—hearsay issues aside—it is unclear how this evidence could be deemed either exculpatory or useful for impeachment purposes. If anything, the self-defense argument would be exculpatory as to defendant Clark, not Franklin, and, as noted above, the circumstances under which defendant Clark may have fought with Wellman are irrelevant to appellants' culpability under a theory of aiding and abetting because, as appellants emphasized in their briefs, Clark's punch came *before* the appellants' involved themselves in the attack.[6]

### D. Police Investigation of Witnesses

 Neither does the government's failure to disclose that two of the government's trial witnesses had been investigated by the police violate *Brady*. Franklin argues that the fact that two of the government's trial witnesses have been under investigation should have been disclosed, and that he should have been allowed to cross examine the witnesses on this issue "as it raised possible motive to curry favor with the government in testifying in this proceeding." Franklin concedes, however, that he "stumbled upon" the information "during trial," and he does not make clear when exactly he discovered this information or whether there was adequate time to use the information for impeachment purposes. Because the government's fail-

---

been specific on the number of other unidentified participants. The second witness has stated that a total of approximately seven assailants were involved, including the three charged defendants."

5. We note that Franklin does not argue that the calls would have been useful for impeachment purposes. Therefore, we need not con-

sider this issue. *See Hunter, v. United States*, 606 A.2d 139, 144 (D.C.1992) ("[P]oints not asserted with sufficient precision to indicate distinctly the party's thesis will normally be spurned on appeal." (citation and quotation marks omitted)).

6. Franklin makes no defense of others argument.

ure to disclose the fact that two witnesses under investigation fails to create a reasonable doubt about the appellants' guilt when evaluated in the context of the entire record, Franklin has failed to establish the level of materiality required for a finding of prejudice. *Strickler, supra,* 527 U.S. at 280, 119 S.Ct. 1936; *Agurs, supra,* 427 U.S. at 112, 96 S.Ct. 2392.[7]

### E. Adrianne's Phone Records

The government's failure to provide copies of phone records, showing a call between Adrianne and defendant Clark until after opening statements, does not violate *Brady.* Franklin argues that the phone records were "essential to the preparation of the defense" and that he was therefore substantially prejudiced by not having them before trial. Records of a call between Adrianne and defendant Clark can-

not be exculpatory, however, because how many people attacked Wellman or who was the principal of that attack is irrelevant to the appellants' culpability under a theory of aiding and abetting. *See* Parts II.B. and IV., *supra.* Second, it is unclear how the information would be useful for impeachment beyond the use to which Franklin has already put it.[8] Thus, he fails to create a reasonable doubt about the appellants' guilt when evaluated in the context of the entire record, and we affirm the trial court on this point.[9]

For the foregoing reasons, the appellants' convictions are

*Affirmed.*[10]

---

7. Franklin does not argue that the information could have been exculpatory under *Brady,* nor is it clear how he could make such an argument in light of the fact that the appellants' guilt does not depend on how many other people participated in the crime's commission. *See* Parts II.B. and IV., *supra.*

8. On direct, Adrianne noted that Alisha was not the only one to whom she had lent her phone during the drive from the cabaret to the murder scene, and when Johnson's counsel asked Adrianne on cross examination if she had called defendant Clark during the drive, she stated that if her phone was used to call defendant Clark, "it wasn't used by [her]." When it was Franklin's turn for cross-examination, his counsel verified that Adrianne claimed to have not used the phone herself but that she had lent it to Alisha and to a friend, LaDonna, who was supposed to be calling her own cell phone in an attempt to locate it. Franklin's counsel then challenged Adrianne on her story by using those same phone records to prove that her phone made four calls to Adrianne's residence during that drive and that, as Franklin's counsel pointed out, LaDonna's "cell phone is not [Adrianne's] home number."

9. Franklin also contends, without elaboration, that the government's failure to disclose

Adrianne's grand jury testimony that Wellman's sister had come looking for her because she believed that Adrianne had set up Wellman violated *Brady.* Thus, we decline to address this argument. *See Hunter, supra,* 606 A.2d at 144 (" '[P]oints not asserted with sufficient precision to indicate distinctly the party's thesis will normally be spurned on appeal.' ").

10. Appellants also argue that the trial court wrongfully denied their Super. Ct.Crim. R. 16 pre-trial motions to compel production of 911 audio tapes and police radio communications. This argument fails, however, because appellants have not satisfied Rule 16's materiality requirement for cases where, as here, the government specifically stated that it did not intend to use the calls or radio runs in its case-in-chief (nor did it use any of them in the actual trial), and the items were not "obtained from or belong[ing] to" appellants. *See* Super. Ct.Crim. R. 16(a)(1)(C). The materiality threshold requires "presentation of 'facts which would tend to show that the Government is in possession of information helpful to the defense.' " *United States v. Curtis,* 755 A.2d 1011, 1014–15 (D.C.2000) (citing *United States v. Santiago,* 46 F.3d 885, 893 (9th Cir.1995)). This showing of materiality is not a high threshold, but "[n]either a

general description of the information sought nor conclusory allegations of materiality suffice." *Id.*

First, we note that it is unclear on this record whether such calls or radio runs ever existed in this case, given that the narrative presented at trial shows Wellman being taken to the hospital in his own car, and neither the government nor appellants mentioned any 911 calls or radio runs in their opening statements, nor do appellants allege that such information was raised during trial. Second, appellants provide no facts tending to show that the information would have been helpful to the defense. Rather, they conclusorily allege that, assuming the calls existed, the "caller's and police officers' descriptions of the scene, as well as *potential* identifications of perpetrators or estimates of their numbers, are *nearly certain* to provide either inculpatory or exculpatory information" and that such calls or radio runs "*may* have provided spontaneous, first-hand accounts of the events leading up to Wellman's death and *may* have rebutted testimony of prosecutions [sic] witnesses" (emphasis added). Indeed, appellants' request on appeal implicitly recognizes their failure to show the materiality of any calls or runs that may exist: that we "remand this issue to the trial court for an evidentiary hearing to determine *whether* the transcripts of the 911 call and radio runs contained evidence that would have been helpful to [the appellants'] defense" (emphasis added). Moreover, because appellants cannot show that the court's denying the motion deprived them of material information, they cannot show that their defense was prejudiced as a result of the court's decision, and thus we affirm the trial court on this point. *Joseph v. United States*, 926 A.2d 1156, 1166 (D.C.2007) ("Denials of [Rule 16] requests can be overturned on appeal only for abuse of discretion, and only on a showing that the defense was prejudiced.").