*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-8

RONALD L. ATKINSON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-17195-12)

(Hon. Robert I. Richter, Trial Judge)

(Argued April 21, 2015                                   Decided July 30, 2015)

*Judith L. Wheat*, with whom *Marlon C. Griffith* was on the brief, for appellant.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, and *Suzanne Grealy Curt*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and MCLEESE, *Associate Judges*, and NEBEKER, *Senior Judge*.

NEBEKER, *Senior Judge*: Following a jury trial, Ronald L. Atkinson appeals his conviction of one count of stalking, in violation of D.C. Code § 22-3133 (a)(3) (2012 Repl.), and six counts of Violating a Civil Protection Order (CPO), in

violation of D.C. Code §§ 16-1004 (d), -1005 (g) (2012 Repl.).[1]  Appellant contends that the trial court erred in three respects, each requiring reversal of his convictions:  (1) the trial court committed reversible error when it failed to instruct the jury on the statutory definition for the term "course of conduct"; (2) the trial court issued instructions that merged alternative theories of liability with respect to the stalking charge; (3) the trial court erred when it denied appellant's request for a mistrial.  Having reviewed the record, we conclude that the trial court only committed error when it issued an instruction that merged alternative theories of liability under the stalking statute.  However, given the substantial evidence put forward by the government with respect to appellant's objectively alarming behavior, the error was harmless.  Accordingly, we affirm appellant's convictions.

## I.

This case stems from actions taken by appellant after the demise of his relationship with Ms. Halima Roebuck.  Appellant and Roebuck first met in 1998, and began a cordial friendship that became "intimate" after both individuals moved

---

[1]  Appellant was sentenced to twelve months of incarceration, six months suspended for the felony stalking conviction, ninety days of incarceration for each of the six CPO violations—to run concurrently with one another and consecutively to the stalking charge—and two years' post-incarceration supervised release.

to the District of Columbia in 2002. Sometime around 2003, the relationship began "unraveling." Roebuck last communicated with appellant at the end of February 2004. From 2005 to 2011, appellant sent Roebuck numerous emails from multiple email addresses in an attempt to reconcile their differences and re-establish contact. Roebuck never responded.

At some point, appellant—for reasons not revealed in the record—believed that he and Roebuck had a child together,[2] and in December of 2011 escalated his attempts to try to contact Roebuck. On the morning of December 23, 2011, appellant called Roebuck and left a voicemail. Appellant then called her multiple times throughout the evening, often "back-to-back." The phone calls continued into the early morning hours of December 24, 2011, when appellant called Roebuck's residence at 1:48 a.m. At some point, Roebuck's fiancé[3] answered the phone and told appellant that he "need[ed] to stop calling." Appellant told

---

[2] Roebuck became aware of appellant's belief that the two had a child together in December 2011, but Roebuck had not spoken with appellant about the matter. Appellant had told the police and members of Roebuck's family that he thought he had a child with Roebuck.

[3] A review of the trial transcripts fails to establish this individual's name. He did not testify at trial, and is referred to as Roebuck's "fiancé" throughout the proceedings. Roebuck testified that the two were then married, but did not disclose his name.

Roebuck's fiancé to "put Halima on the phone, put Halima on the phone." Roebuck's fiancé responded with "Halima doesn't want to talk to you," and that "I don't want you calling this house anymore." Following appellant's phone calls, Roebuck unplugged her phone and eventually obtained an unlisted number.

After calling Roebuck's residence a number of times unsuccessfully, appellant attempted to contact members of Roebuck's family—including her mother and her father—and told each parent that he and Roebuck had a child together. Roebuck's mother refused to speak with appellant and called the police. Roebuck's father "specifically" told appellant not to "communicate with any of [the Roebuck family]" because appellant's behavior "was bordering on harassment." He also "told [appellant] that [Roebuck] does not have a child," that he was "not a grandfather," and that appellant "should try to seek some sort of treatment."[4] On December 27, 2011, appellant appeared at an apartment building where Roebuck had previously lived.[5] Appellant "stood outside for a couple of minutes," and then "came inside" and used the call box to dial the direct number to

---

[4] Sometime thereafter, appellant filed a petition for custody in Montgomery County Circuit Court, which was dismissed for want of foundation.

[5] Roebuck's aunt and uncle lived in the unit on the date that appellant attempted to access the apartment building.

Roebuck's old apartment. When appellant was approached by the security guard, appellant told the guard that he was "family," and asked if he could "go upstairs and wait by the door." Appellant was rebuffed in his attempts, and left. He returned the following day. Roebuck, however, had obtained a Temporary Protection Order (TPO)[6] against him that had been disseminated to the apartment building's security staff. When appellant arrived, security informed him that he was not permitted in the building. He was called into the property manager's office, and then the police were called. Appellant, however, left the building before police arrived.

On May 6, 2012, appellant's conduct toward Roebuck reached a head. At 1:30 a.m., Roebuck received "back-to-back" phone calls from a number that registered as private on her caller I.D. Roebuck then began to receive calls on her cell phone indicating that someone was ringing the call box outside of her

---

[6] On December 28, 2011, Roebuck obtained a TPO against appellant that prohibited appellant from contacting Roebuck, her fiancé, her parents, and other members of her family, and from visiting each individual's respective residence. Appellant received a copy of the TPO. The TPO was extended, and a hearing was set for February 10, 2012, in Superior Court. Following the hearing—which both Roebuck and appellant attended—the TPO was converted into a one-year CPO. The order prohibited appellant from assaulting, threatening, harassing, or stalking Roebuck, and ordered him to stay at least one hundred feet away from Roebuck's person, home, place of work, and Roebuck's family's residences at all times.

apartment building. Roebuck thought it was appellant contacting her again because of the "pattern" of his behavior, but could not be certain. Roebuck eventually called the police. She testified that she was fearful because she was alone in the apartment; her fiancé was out of town. At 3:00 a.m., she received multiple phone calls from a "blocked number." Later that morning, Roebuck took "precautions," and contacted JaBen Early, her "godbrother,"[7] and told him that she was "receiving nonstop calls" from a "private" number. Early did not know whether Roebuck told him that the calls she had received were actually from appellant, but Early suspected it was "in relationship to that." Early agreed to stay with Roebuck at her residence until her fiancé returned.

Early arrived at Roebuck's apartment building at approximately 12:30 p.m. on May 6th, and observed appellant standing outside of the building, glancing at his cellphone and pacing back and forth.[8] When Early saw appellant attempt to follow several unaffiliated people into the building, Early confronted appellant and

---

[7] Mr. Early described his relationship with Halima Roebuck as one in which "she is like one of my God sisters. Her father and my father have been close over the years but we never met till we were in college. So we didn't really have a relationship until we were in college."

[8] When Early arrived, he called Roebuck and communicated to her appellant's location and his activities.

"told him not to go inside."[9]  Appellant responded that he "just want[ed] to talk to her" because "[s]he has my baby."  At this point, Metropolitan Police Department (MPD) motorcycle officer Richard West arrived in response to a 9-1-1 call placed by Roebuck.  As Officer West approached both Early and appellant, Early told Officer West that "there he is right there, Officer; that's the one that has the CPO order against him."  In response, appellant pointed at Early "and said no, he's the one who has the CPO order against him."  Early repeated that Officer West "need[ed] to get him" because "[he]'s stalking my God sister."  To sort through the conflicting stories, Officer West "engaged [appellant] in a conversation about their relationship."  As appellant was conversing with Officer West, Officer Warren Jones—West's partner—arrived at the scene.  Early again told the two officers that "they needed to arrest [appellant] because [Roebuck] has a civil protection order against him."  Appellant responded by telling the MPD officers "that he had a child with [Roebuck]."  He then glanced at Early "and then just ran away."

Appellant fled from the officers down an adjacent alleyway and jumped a fence, but did not have "anywhere to go."  The officers pursued him up to the fence.  Appellant told the officers that he "just want[ed] to see [his] daughter," and

---

[9]  Early knew appellant because the two had attended the same college and they shared mutual friends.

Officer Jones attempted to coax appellant into climbing back over the fence by telling him that he could "see" his daughter. At that time, appellant fled from the officers by scaling a second fence, used piping attached to the apartment building to climb to the roof, and then began to run "from roof to roof" on top of the buildings. The officers were unable to maintain pursuit.

Following the May 6 incident, appellant attempted to contact Roebuck a number of times. Evidence presented showed that appellant called Roebuck at least eight times on May 10, 2012. Appellant also called her on May 11 at 12:54 a.m., and Roebuck "continue[d] to receive numerous calls . . . in the subsequent days." Roebuck never responded.

Appellant was charged on April 9, 2013.[10] At trial, the government and appellant stipulated to the following: (1) that on February 10, 2012, in a separate matter, Superior Court ordered appellant to stay away and have no contact with Roebuck, and that appellant signed the order; (2) on February 10, 2012, appellant

---

[10] The underlying events that formed the basis of this appeal related to appellant's actions toward Roebuck from May 6 to May 15, 2012. In a separate criminal matter, not on appeal before this court, appellant pleaded guilty to one count of stalking, which involved phone calls made by appellant to Roebuck on December 23 and December 24, 2011. The separate criminal matter was presented to the jury as a stipulation of certain facts.

admitted that by calling Roebuck numerous times on December 24, 2011, appellant either intended to or should have known that his actions would cause Roebuck to fear for her safety, feel seriously alarmed, or frightened, or suffer emotional distress as a result. Following his conviction, appellant filed a timely appeal.

## II.

Now, the merits. We first address appellant's claim that the trial court committed reversible error when it failed to include the jury instruction that defined the term "course of conduct,"[11] a term used in the statutory definition for stalking. *See* D.C. Code § 22-3133 (a). We review for plain error, as appellant failed to preserve the issue for appeal. At trial, "objections must be made with reasonable specificity" and "the trial judge must be fairly apprised as to the question on which he is being asked to rule." *Comford v. United States*, 947 A.2d 1181, 1186 (D.C. 2008) (citation omitted). When jury instructions are at issue, objection below must "be made with sufficient precision to indicate distinctly the party's thesis." *Williams v. United States*, 858 A.2d 984, 990 (D.C. 2004) (quoting

---

[11] "Course of conduct" is defined at D.C. Code § 22-3132 (8) (2012 Repl.).

*Russell v. United States*, 698 A.2d 1007, 1012 (D.C. 1997)); *see also* Super. Ct. Crim. R. 30.

A review of the record establishes that the only instance in which appellant's counsel at trial mentioned the "course of conduct" definition was a brief request made via email to the trial court on the morning in which jury instructions were to be discussed.[12] There is no evidence of record that counsel mentioned, noted, inquired about, or requested the jury instruction that defines "course of conduct," or that he specifically objected to its exclusion. Counsel had ample opportunity to object, as the trial court specifically asked him if "there [were] any other changes to the instructions other than what you have sent us," and then read off the two changes that had been discussed, but failed to mention counsel's request to add "the means" by which appellant stalked Ms. Roebuck. The single written request, briefly noted in an email to the trial court before jury instructions were discussed is insufficient to preserve the issue for appeal. *See Guishard v. United States*, 669 A.2d 1306, 1315 (D.C. 1995) (overruled in part by *Robinson v. United States*, 100 A.3d 95, 107 (D.C. 2014)) (concluding plain error review applies when trial

---

[12] The email requested two modifications to the proposed instructions. One modification was to insert the means that appellant relied on to allegedly stalk Ms. Roebuck. The second was to add language regarding appellant being on notice to stay away from a residence and to define the word "contact."

counsel submits a proposed instruction, the instructions are discussed by all concerned, counsel failed to object and never asked to add the earlier requested instruction).

Assuming without deciding that the trial court's failure to instruct the jury on the definition for the term "course of conduct" was error, and that such error was plain, it nonetheless does not require reversal, as appellant has failed to establish that his substantial rights were affected. As an initial matter, appellant has proffered no persuasive reason to show that the jury misunderstood the term, or could not properly apply the term to the facts. Similarly, the record contains no indication that the jury was either misled, or experienced confusion as to the term "course of conduct," even though it engaged in lengthy deliberations without a definition. *See Zeledon v. United States*, 770 A.2d 972, 976 (D.C. 2001) (note from the jury requesting the definition of a term indicated confusion). Moreover, the record contains very strong evidence that appellant "directly or indirectly . . . in person or by any means, on two or more occasions . . . follow[ed], monitor[ed], place[d] under surveillance, threaten[ed] or communicate[d] to . . . another individual." D.C. Code § 22-3132 (8)(A). *See Owens v. United States*, 90 A.3d 1118, 1124 (D.C. 2014) (concluding appellant failed to show that his substantial rights were affected by an assumed "obvious error" due to "the overwhelming

proof against him"); *see also Wilson v. United States*, 785 A.2d 321, 328-29 (D.C. 2001) (appellant failed to show plain error because a reasonable juror would find that the omitted requirement had been established); *Guishard*, *supra*, 669 A.2d at 1315 (concluding that no plain error occurred "because, in any event, the evidence was sufficient to permit the jury reasonably to find [that appellant's were guilty]"). Thus, as the government presented strong and compelling evidence to the jury concerning appellant's behavior towards Roebuck and the record is bereft of evidence that the jury would have found guilt based on something that did not rise to the level of a course of conduct, the evidence is sufficient beyond a reasonable doubt to support the jury's finding of guilt, the assumed error, even if plain, did not affect appellant's substantial rights. *Wilson*, 785 A.2d at 326 (quoting *Olano v. United States*, 507 U.S. 725, 736 (1993)). It follows that the trial court did not plainly err.

## III.

Appellant next contends that the trial court committed reversible error when it instructed the jury concerning the charge of stalking. Appellant was charged under D.C. Code § 22-3133 (a)(3), which requires the government to prove beyond a reasonable doubt that appellant "purposefully engage[d] in a course of conduct

directed at a specific individual . . . [t]hat the person should have known would cause a reasonable person in the individual's circumstances to fear for his or her safety or the safety of another person, feel seriously alarmed, disturbed, or frightened, or suffer emotional distress." At trial, the government requested that the court alter the final instruction to add the language "Halima Roebuck or" before "a reasonable person in Ms. Roebuck's circumstances." Over objection, the trial court found that the government was entitled to the instruction. The final jury instruction read that

> [t]he elements of stalking . . . are that one that the defendant purposely engaged in a course of conduct directed at Halima Roebuck . . . [and] [w]hen he did so, he knew or he should have known that his conduct would *cause Halima Roebuck or a reasonable person in Halima Roebuck's circumstances* to either fear for her safety or feel seriously alarmed, distributed, or frightened or to suffer emotional distress.

Essentially, the trial court's instruction merged § 22-3133 (a)(3) and § 22-3133 (a)(2), but omitted language under (a)(2) that required the jury to conclude that appellant's actions would cause Ms. Roebuck "reasonably" to fear for her safety, feel seriously alarmed/disturbed/frightened, or to suffer emotional distress. The government concedes "that the trial court erred by merging the alternative intent theories." The "only issue before th[e] jury" was appellant's state of mind,

and the merger of liability theories in the final instruction may have impermissibly reduced the government's burden to convict by allowing the jury to find appellant guilty if he caused Ms. Roebuck to subjectively but unreasonably experience the enumerated emotional harm. We therefore review for harmlessness under the elevated constitutional standard, first articulated in *Chapman v. California*, 386 U.S. 18, 23 (1967). Reversal is required unless "the error was harmless beyond a reasonable doubt." *Johnson v. United States*, 980 A.2d 1174, 1181 (D.C. 2009). Stated differently, we must determine whether the government proffered such overwhelming evidence so as to preclude an "impartial juror" from "reasonably conclude[ing]" that appellant did not engage in a course of conduct that would cause a reasonable person in Halima Roebuck's circumstances to fear for her safety. *Id.* (quoting *Wilson-Bey v. United States*, 903 A.2d 818, 846 (D.C. 2006)). "If there exists a reasonable possibility that the jury's verdict on a given count was affected by the instructional error," then appellant is entitled to relief. *Robinson*, *supra*, 100 A.3d at 108 (citation omitted).

Appellant's principal argument is that the instructions permitted the jury to convict appellant if it determined that he should have known that his actions would cause Roebuck to be fearful, even though her fear was objectively unreasonable. We find this argument unpersuasive for two reasons. First, appellant's conduct

towards Roebuck was objectively frightening and alarming, regardless of context or motive. Here, appellant's behavior included repeated, unwanted calls at all hours, including late at night; unsolicited visits to Roebuck's past residence and her parents' residences; and attempts to gain unauthorized access to Roebuck's apartment building. The foregoing are all actions that an impartial juror could easily find to be objectively frightening, alarming, or disturbing. That appellant was attempting to locate a child he thought existed (and who was told that did not exist) does not render such activity benign. The record demonstrates that there were numerous instances in which appellant engaged in conduct that a reasonable, impartial juror could find to be alarming.

Second, the jury was presented with substantial—almost overwhelming—evidence of appellant's objectively frightening behavior to support the conclusion that the government proved beyond a reasonable doubt that appellant's actions would cause a reasonable person under the circumstances to be frightened/alarmed/disturbed or to suffer emotional distress. Evidence established that appellant sent numerous, unsolicited emails to Roebuck between 2005 and 2011, none of which were returned. On December 23 and 24, 2011, appellant placed multiple phone calls to appellant, including a call at 1:48 a.m., leading Roebuck to change her phone number. Appellant was told not to call back.

Appellant then personally contacted both of Roebuck's parents, telling each that he and Roebuck had a child together. Appellant was told that he was mistaken. Appellant attempted to contact Roebuck by appearing at her old residence, unannounced. Appellant returned a second time and the police were called. Roebuck obtained a TPO, and then a one-year CPO against appellant. Appellant was aware that the CPO was in place and that he should have known that his prior conduct toward Roebuck would cause her to fear for her safety, feel seriously alarmed, or frightened, or suffer emotional distress as a result. On May 6, a blocked number called Roebuck multiple times in the middle of the night. Appellant appeared at Roebuck's residence later that day, still claiming that Roebuck was hiding appellant's child from him. Appellant attempted to gain unauthorized access to the building, prompting Roebuck to call 9-1-1. Appellant fled from the police, and subsequently called Roebuck numerous times between May 10 and May 15, 2012.

Given the substantial evidence presented of appellant's repeated conduct and the objectively alarming nature of the conduct, there was no "reasonable possibility that the jury's verdict . . . was affected by the instructional error." *Robinson*, *supra*, 100 A.3d at 108 (citation omitted). Thus, a reasonable, impartial juror would conclude beyond a reasonable doubt that appellant engaged in a course of

conduct that would cause a reasonable person in Halima Roebuck's circumstances to fear for her safety or feel seriously alarmed, disturbed, or frightened. *Wilson*, *supra*, 785 A.2d at 329. The error was harmless.

## IV.

We now turn to appellant's final claim, where he contends that the trial court erred when it denied appellant's request for a mistrial. The factual background for the issue is as follows. At trial, the government presented an eleven-minute audio recording of Roebuck's 9-1-1 call after appellant appeared at her residence on May 6, 2012. Two statements included in the call prompted appellant's motion for a mistrial. The first was a statement made by Roebuck to the 9-1-1 operator that "during the ordeal my mom's house burned down so [appellant] is very dangerous."[13] The second was a statement made by the operator to Roebuck in which she stated that "people with mental conditions are capable of anything so you have to be careful."

---

[13] A redacted copy of the call that omitted the "house burning" comment was provided before jury deliberations. No transcript of the 9-1-1 call was provided.

Immediately after the recording ended, the trial court, *sua sponte*, told the jury that "there was some reference in that call to a house burning down," but "[t]hat [it] has nothing whatsoever to do with this case. Please disregard it." The trial court found that the inclusion of the statements was "extraordinarily negligent," a "gross kind of mistake," and "merely negligent," but even then denied appellant's motion for a mistrial. The trial court reasoned that the government did not engage in "deliberate misconduct," and that it was "confident that [the statements] w[ould] not affect the outcome of the case." The trial court did, however, offer to give "whatever additional instruction" appellant wanted, and offered "to have a stipulation that there was absolutely no connection to [the] house burning down." The government concedes that the statement concerning Roebuck's mother was erroneously included in the audio recording.

It is well-established that a mistrial "is a severe remedy . . . to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *Parker v. United States*, 757 A.2d 1280, 1286 (D.C. 2000) (citation omitted). The trial court exercises "broad discretion" with respect to the motion, *Gordon v. United States*, 783 A.2d 575, 583 (D.C. 2001), and "[w]e will reverse the trial court's denial of a motion for a mistrial only if it appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of

justice." *Metts v. United States*, 877 A.2d 113, 118 (D.C. 2005) (quoting *(Ronald) Coleman v. United States*, 779 A.2d 297, 302 (D.C. 2001)).

When an errant comment or testimony creates the possibility of prejudice, "an effectively worded curative instruction rendered in a timely manner may serve to rectify the error." *Hazel v. United States*, 319 A.2d 136, 138 (D.C. 1974). But when "comments are particularly prejudic[ial]" to a defendant, "even a curative instruction may not be relied upon to overcome the prejudice." *Lucas v. United States*, 102 A.3d 270, 282 (D.C. 2014) (noting that "timely limiting and curative instructions can be an important consideration" in determining harmlessness). We have little difficulty acknowledging that the first statement at issue—Roebuck's discussion of her mother's house being burned down—prejudiced appellant to a degree. However, we conclude that the trial court's *sua sponte* curative instruction was sufficient to remedy the prejudice.

When the trial judge's instruction to the jury is "prompt, complete, persuasive, and to the point," *Metts*, *supra*, 877 A.2d at 119 (quoting *Peyton v. United States*, 709 A.2d 65, 72 (D.C. 1998)), we "should not readily assume that the jury could not or would not follow it." *Id.* (quoting *Peyton*, *supra*, 709 A.2d at 72); *see Plater v. United States*, 745 A.2d 953, 959 (D.C. 2000) (citation omitted)

(recognizing the "almost invariable assumption of the law that jurors follow their instructions"); *see also McRoy v. United States*, 106 A.3d 1051, 1061 (D.C. 2015) (citation omitted) (noting that the trial court "issued a clear curative instruction, which we presume the jury followed, absent evidence to the contrary"). The trial court's curative instruction was "succinct and unambiguous." *Metts*, *supra*, 877 A.2d at 118. Accordingly, the prompt and "to the point" curative instruction sufficiently neutralized prejudice inflicted upon appellant from the errant evidence. *Id.* at 119 (concluding that the trial court's prompt instruction that testimony "bears absolutely no relationship" to the case following errant testimony was sufficient); *see also Bennett v. United States*, 597 A.2d 24, 27 (D.C. 1991) (noting that prejudice to appellant is diminished when, after a motion for a mistrial, the trial court instructs the jury to ignore the prejudicial testimony).[14] Moreover, the government presented a substantial quantity of compelling evidence to support its charges. *Lucas*, *supra*, 102 A.3d at 283 (considering the "strength of the

---

[14] Appellant argues that the first statement constitutes "evidence of prior crimes" that has reached the jury, where it is "most difficult, if not impossible, to assume continued integrity of the presumption of innocence . . . ." Even assuming Roebuck's statement was evidence of "prior crimes," we have held that "it is necessary that the trial court give the jury an *immediate* instruction warning it . . . not to consider that evidence as tending to show in any other way the defendant's guilt of the offenses for which he is on trial." *(Ronald) Coleman*, *supra*, 779 A.2d at 304 (emphasis in original) (citation omitted). The trial court did so here, issuing an immediate curative instruction *sua sponte*.

government's case" in concluding that an errant prosecutorial comment did not substantially prejudice the defendant).

Turning to the second statement—the 9-1-1 operator's comment concerning the capability of people who are mentally unstable—we note that appellant did not seek a curative instruction from the trial court. We have long "recognize[d] that there are situations where, as a matter of strategy, defense counsel may decide that it is more effective simply to let a potentially prejudicial remark pass, rather than drawing attention to it further by requesting a curative instruction." *Clark v. United States*, 639 A.2d 76, 80 (D.C. 1993). Nonetheless, "where a defendant asserts that certain testimony is so prejudicial as to require a mistrial, yet refuses any curative instruction, we will still consider whether a curative instruction was available that might have mitigated the alleged harm to the defendant's case." *Id.*

Here, the 9-1-1 operator made a single, off-hand comment during a nearly eleven-minute exchange with Roebuck. The operator had absolutely no knowledge of who appellant was, what he had done, his mental state, or his medical history. The statement is tantamount to personal opinion and is "merely speculative evidence" of appellant's possible mental state supported by no evidence. *Clark, supra*, 639 A.2d at 80. We do not think that the operator's comment caused

appellant sufficient prejudice to warrant a mistrial. The comment was isolated, fleeting, and speculative in nature. An available curative instruction[15] from the trial court would have "significantly minimized any possible prejudice to the appellant."[16] *Id.* at 81. And again, we note that there was substantial evidence, bordering on overwhelming, before the jury to establish appellant's guilt.

From a review of the record, we cannot say that the trial court's decision to deny appellant's motion for a mistrial was "irrational, unreasonable, or . . . a miscarriage of justice," and no abuse of discretion occurred. *Bragdon v. United States*, 668 A.2d 403, 405 n.2 (D.C. 2005) (citation omitted).

*****

---

[15] The trial court offered to do "more," to address the statement, but didn't "think anyone [was] going to make anything out of that."

[16] We do not imply that appellant waived his right to relief by failing to ask for a curative instruction. Under the circumstances, however, the trial court offered further instruction regarding the 9-1-1 operator's isolated and fleeting comment. The availability of a proper instruction to limit any potential prejudice supports our conclusion that under the circumstances of this case, a mistrial was not warranted.

For the aforementioned reasons, we affirm appellant's convictions. Accordingly, the judgment is

*Affirmed.*